**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| THE UNITED STATES OF AMERICA and COMMODITY FUTURES TRADING COMMISSION,<br><br>                    Plaintiffs,<br><br>          v.<br><br>STATE OF MINNESOTA; TIM WALZ, in his official capacity as Governor of Minnesota; KEITH ELLISON, in his official capacity as Attorney General of Minnesota; MINNESOTA DEPARTMENT OF PUBLIC SAFETY; JON ANGLIN, in his official capacity as Director of the Minnesota Department of Public Safety, Alcohol and Gambling Enforcement Division,<br><br>                    Defendants. | Case No. _____<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

**COMPLAINT**

Plaintiffs, the United States of America and the Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through their undersigned counsel, bring this civil action for declaratory and injunctive relief, and allege as follows:

## I.    INTRODUCTION

1.    The Commodity Exchange Act ("CEA" or the "Act"), 7 U.S.C. §1, *et seq.*, provides a comprehensive framework for the regulation of commodity derivatives transactions in the United States. This federal law gives the CFTC, a federal agency, "exclusive jurisdiction" over the regulation of commodity futures, options, and swaps traded on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). Plaintiffs bring this action to halt Defendants' efforts to criminalize the operation of derivatives markets governed by federal law.

2.    On May 18, 2026, Minnesota Governor Tim Walz signed SF 4760 into law, the first outright ban on "prediction markets" in the United States. *See* Ex. A, pp. 79–82 (codified at Minn. Stat. § 299L.03(12), § 609.75(3)(2), and § 609.7615 (as amended)). These markets are CFTC-registered exchanges, and the contracts they offer—derivative instruments called "event contracts"—have traded under the Commission's oversight for decades. If Minnesota's law is permitted to go into effect, the exchanges that offer these longstanding contracts—as well as those who partner with them—can be prosecuted as felons. This flagrant and unprecedented incursion into the Commission's exclusive regulatory sphere must be preliminarily and permanently enjoined.

1

3.      As defined by Article 8 of SF 4760, "prediction markets" are markets "that allow[] consumers to place a wager on the future outcome of a specified event that is not determined or affected by the performance of the parties to the contract, including but not limited to" sporting events, elections, official government action, and the weather. Minn. Stat. § 609.7615(1)(e). In other words, a "prediction market" is an exchange that offers what is known in the derivatives community as "event contracts."

4.      SF 4760's unrestrained scope makes it a felony to, among other things, (1) "create[] a prediction market," (2) "operate[], manage[], or control[] a platform or system intending that consumers will use the platform or system to make wagers in a prediction market," (3) "intentionally facilitate[] the operation of a prediction market" by various means, and (4) "advertise[] or market[] financial or technological products that promote transactions prohibited under this section." Minn. Stat. § 609.7615(2).

5.      SF 4760 also empowers Defendants to demand that "prediction markets" cease and desist trading and, upon a showing the entity will or is about to violate the state law, requires Minnesota courts to "grant . . . permanent or temporary injunction[s], restraining order[s], or writ[s] of mandamus." Minn. Stat. § 299L.03(12)(a)–(b).

6.      The event contracts targeted by SF 4760 are "swaps" under the CEA, and the "prediction markets" that offer these event contracts are CFTC-regulated Designated Contract Markets (DCMs).

7.      Minnesota's efforts to ban federally regulated event contracts and prohibit DCMs from operating intrudes on the exclusive federal scheme Congress designed to oversee the derivatives industry. Prompted by the evolution of national futures markets and

2

repeated conflicts with state law, Congress enacted the CEA, granting the CFTC "exclusive jurisdiction" to regulate those markets and enacting a comprehensive federal regulatory framework that preempts state laws that attempt to regulate the operation of, or transactions on, CFTC-regulated exchanges. 7 U.S.C. § 2(a)(1)(A). It has also given the Commission discretionary authority to approve or disapprove of certain event contracts based on whether they are, in the Commission's evaluation, contrary to the public interest. *Id.* § 7a-2(c)(5)(C). This comprehensive federal regulatory scheme expressly and impliedly preempts the challenged provisions of SF 4760.

8.      The Commission exercises its comprehensive jurisdiction over event contracts in a variety of ways. It has approved various DCMs that offer event contracts, including KalshiEX (Kalshi), QCX (Polymarket), Gemini Titan, LLC, and North American Derivatives Exchange, Inc. (Nadex). It monitors the event contracts that DCMs self-certify with the CFTC (more than 3,000 to date). It brings enforcement actions against event-contract participants who violate the CEA or Commission regulations, including insider-trading violations. It signed a Memorandum of Understanding with Major League Baseball to permit information sharing to ensure market integrity in sports-related event contracts. And it has solicited comments for a potential rulemaking around event contracts. The Commission is thus fully engaged with the event contracts that are subject to its jurisdiction, as well as the markets that offer them.

9.      Minnesota is not the first State that has attempted to invade the Commission's exclusive jurisdiction over swaps. Already, several federal courts—including the Third Circuit—have swiftly responded by issuing temporary restraining

orders and preliminary injunctions barring the States from enforcing their gambling laws against CFTC-regulated exchanges. *See, e.g.*, *KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026).

10.    Emergency and permanent injunctive relief is even more critical in Minnesota. Unlike other States, which have largely attempted to enforce their existing gambling laws against sports-related event contracts, Minnesota enacted a tailor-made prohibition that targets *all* event contracts, including contracts on the "the actions . . . of the federal, state, or local government," as well as "weather events or conditions." Such contracts have traded for decades and have obvious utility in hedging against significant commercial and economic risks.

11.    Furthermore, Minnesota targets not only the DCMs that offer event contracts, but also persons who facilitate their operation—including Futures Commission Merchants (FCMs) and Derivatives Clearing Organizations (DCOs), who are both subject to CFTC jurisdiction. It also targets a sweeping range of other actors: those who "identify[] or list[] events knowing the events will be used by consumers to make wagers" (potentially including major news organizations), those who provide "verification services" (potentially including news organizations as well as professional sports leagues), those who hold or direct funds for the purpose of taking a position on an event contract (potentially including banks and credit-card companies), those who provide "supportive services to a prediction market" (potentially including blockchain and other technology firms), and those who "advertise[] or market[] financial or technological products that promote" event contracts (an untold range of potential targets). Minn. Stat. § 609.7615(2).

4

12.     The United States and the Commission are injured by SF 4760. The federal government has a statutorily protected interest in maintaining exclusive jurisdiction over transactions involving swaps on DCMs, as well as in administering the CEA's comprehensive regulatory structure. If permitted to go into effect, Minnesota law will criminalize exchanges that the Commission has expressly approved, as well as event contracts that have been self-certified to the Commission and that the Commission has permitted to be listed. These consequences directly harm the federal government's legally protected interest in enforcing federal law.

13.     SF 4760 becomes effective on August 1, 2026, but the federal government's injury is nonetheless both actual and imminent now. The looming threat of criminal liability casts an immediate pall over the markets that the Commission regulates and generates significant uncertainty among exchanges and participants as to the scope and exclusivity of the Commission's jurisdiction. The Commission will also have to dedicate staff time and resources to advising registrants affected by SF 4760 on compliance measures required by federal law, which diverts the Commission from focusing on its regulatory agenda. Further, the United States will be injured when the law goes into effect on August 1, and because that future injury is certainly impending, the government's injury is imminent and therefore cognizable.

14.     The injury to the United States, moreover, is irreparable and requires immediate injunctive relief. Constitutional violations, including Supremacy Clause violations, are always irreparable. Furthermore, if Minnesota is permitted to enforce its law, the harm to the United States's sovereign interests and regulatory jurisdiction could

5

not be undone after final judgment. Preliminary injunctive relief is required to preserve the status quo during the pendency of the case.

15.    The equities and public interest also strongly favor injunctive relief. The enforcement of a preempted state law is never in the public interest. Further, Minnesota's threat of criminal liability will kill the operation of CFTC-regulated exchanges within the State, and, more broadly, inject uncertainty into federal derivatives markets over the scope of the Commission's jurisdiction.

16.    The Court should enforce the Commission's exclusive jurisdiction and issue preliminary and permanent injunctive relief holding Article 8 of SF 4760 to be facially unlawful and unenforceable.

## II.    JURISDICTION AND VENUE

17.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 (federal-question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). This action presents a federal question under the laws and Constitution of the United States because it concerns whether the CEA, 7 U.S.C. § 1, *et seq.*, preempts Minnesota law insofar as it purports to regulate transactions covered by the CEA and entrusted to the Commission's regulatory jurisdiction.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because at least one Defendant resides in this District and all Defendants are residents of the State. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred and will occur in this District.

6

19.     The Court has the authority to provide the relief requested under the Supremacy Clause, U.S. Const. art. VI, cl. 2, as well as 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable powers.

### III.    PARTIES

20.     Plaintiff the United States of America regulates U.S. financial markets, and it enforces federal commodity derivatives laws, through its executive agency, the CFTC.

21.     Plaintiff CFTC is an agency of the United States Government that administers and enforces the CEA. The CEA grants the CFTC authority to represent itself through its General Counsel. 7 U.S.C. § 2(a)(4).

22.     Defendant State of Minnesota is a State of the United States.

23.     Defendant Tim Walz is the Governor of Minnesota and is sued in his official capacity. Under the Minnesota Constitution, the Governor "shall take care that the laws be faithfully executed." Minn. Const. art. V, § 3.

24.     Defendant Keith Ellison is the Attorney General of Minnesota and is sued in his official capacity. The Attorney General of Minnesota is the State's chief legal officer. The Director of the Division of Alcohol and Gambling Enforcement may refer an enforcement action to the Attorney General, including for alleged violations of Minn. Stat. § 609.7615. *See* Minn. Stat. § 299L.03(12)(b).

25.     Defendant Minnesota Department of Public Safety is the Minnesota state agency that enforces Minnesota gambling laws, including Minn. Stat. § 609.7615, through its Alcohol and Gambling Enforcement Division. The Department has authority to arrest or investigate any person who is suspected of committing any crime involving gambling,

and to conduct searches and seizures to enforce any of those laws. Minn. Stat. § 299L.03(5). Additionally, the Department can issue cease-and-desist orders to any person that has engaged in or is about to engage in various gambling violations, including Minn. Stat. § 609.7615. *Id.* § 299L.03(12)(a). The Department can also bring an action in state court to enjoin such violations. *Id.* § 299L.03(12)(b).

26.   Defendant Jon Anglin is the Director of the Minnesota Department of Public Safety's Alcohol and Gambling Enforcement Division, and is sued in his official capacity. The Director has authority to issue cease-and-desist orders to any person that has engaged in or is about to engage in various gambling violations, including Minn. Stat. § 609.7615. Minn. Stat. § 299L.03(12)(a). The Director can also bring an action in state court to enjoin such violations. *Id.* § 299L.03(12)(b).

## IV.   FEDERAL LAW GOVERNING COMMODITY DERIVATIVES MARKETS

### A.   Congress Vested the CFTC with Exclusive Regulatory Authority Over U.S. Commodity Derivatives Markets

27.   The Constitution empowers Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes," U.S. Const. art. I, § 8, cl. 3. The Constitution also vests the President of the United States with the "executive Power," U.S. Const. art. II, § 1, and authorizes the President to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.

28.   Based on its enumerated constitutional and sovereign powers to regulate interstate commerce, the United States has broad authority to regulate futures and derivatives markets. That authority includes the power to enforce the supremacy of federal

law regulating futures and derivatives markets.

29.   The CEA is the federal statute that provides a comprehensive federal framework for the regulation of commodity derivatives transactions in the United States. *See* 7 U.S.C. § 1 *et seq.* The purpose of the CEA is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the Act] and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants." 7 U.S.C. § 5(b).The CFTC is the federal executive agency charged with administering and enforcing the CEA. 7 U.S.C. § 2(a). Congress created the CFTC in 1974 to establish a uniform national system for regulating futures trading after concluding that the then-existing patchwork of state-by-state regulation had impaired the development and functioning of national commodity derivatives markets. *See* H.R. Rep. No. 93-975, at 51 (1974); S. Rep. No. 93-1131, at 36 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5885.

30.   Derivatives are financial instruments such as futures, options, or swaps that derive their value from something else, like a benchmark, a physical commodity, or—as relevant here—certain events or contingencies. In general, market participants use derivatives to hedge risks or speculate on commodity price movements.

31.   Section 2(a)(1) of the CEA provides:

9

> ***The Commission shall have exclusive jurisdiction***, except to the extent otherwise provided in the Wall Street Transparency and Accountability Act of 2010 (including an amendment made by that Act) and subparagraphs (C), (D), and (I) of this paragraph and subsections (c) and (f), ***with respect to accounts, agreements*** (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), ***and transactions involving*** swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), ***traded or executed on a contract market designated pursuant to section 7 of this title*** or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title.

7 U.S.C. § 2(a)(1)(A) (emphasis added). Thus, "transactions involving swaps" traded on DCMs are subject to the Commission's "exclusive jurisdiction." *Id.*

32.    Event contracts are a type of "swap" as defined by the CEA. Section 1a(47)(A) of the CEA, 7 U.S.C. § 1a(47)(A), broadly defines "swap" to include "any agreement, contract, or transaction"—

> (i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

> (ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence; . . .

> (iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap . . . [or,]

> (vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of [these clauses].

7 U.S.C. § 1a(47)(A).

10

33.     The definition in subparagraph (ii) is particularly apt: event contracts "provide[] for . . . payment . . . that is dependent on the occurrence, nonoccurence, or the extent of the occurrence of an event or contingency," and that event or contingency is "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

34.     Event contracts also qualify as swaps under subparagraph (i), in that they are binary options, or "option[s] whose payoff is either a fixed amount or zero," that are based on a commodity (*i.e.*, the underlying event or contingency). CFTC, Futures Glossary, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm#B; *see also* 73 Fed. Reg. 25669, 25670 (May 7, 2008) ("A significant number of event contracts are structured as all-or-nothing binary transactions commonly described as binary options."); 77 Fed. Reg. 25320, 25321 n.6 (Apr. 27, 2012) ("[T]he swap definition . . . includes options . . . .").

35.     Event contracts are also agreements or transactions that have become commonly known to the trade as "swaps." 7 U.S.C. § 1a(47)(A)(iv).

36.     The CEA requires that, subject to certain exemptions or exceptions, commodity derivatives transactions must be conducted on exchanges designated by, or registered with, the Commission. For example, trading of commodity futures contracts must be conducted on a board of trade designated by the CFTC as a contract market or a registered foreign board of trade (*see* 7 U.S.C. § 6 & 17 C.F.R. § 48.3); no person may operate a facility for the trading or processing of swaps unless the facility is registered as a swap execution facility or designated as a contract market (*see* 7 U.S.C. § 7b-3(a) & 17

11

C.F.R. § 37.3); and commodity options must likewise be conducted on a board of trade designated as a contract market (*see* 7 U.S.C. § 6c(b) & 17 C.F.R. § 32.2).

37.     DCMs are boards of trade or exchanges that operate under the regulatory oversight of the Commission pursuant to Section 5 of the CEA, 7 U.S.C. § 7. The Commission designates a board of trade as a contract market through a formal application process through which an applicant board of trade must demonstrate its ability to comply with detailed statutory requirements called "core principles." 7 U.S.C. § 7(d). These core principles require, among other things, that DCMs:

a. "[E]stablish, monitor, and enforce compliance with the rules of the contract market, including—(i) access requirements; (ii) the terms and conditions of any contracts to be traded on the contract market; and (iii) rules prohibiting abusive trade practices on the contract market." 7 U.S.C. § 7(d)(2)(A).

b. "[H]ave the capacity to detect, investigate, and apply appropriate sanctions to any person that violates any rule of the contract market." 7 U.S.C. § 7(d)(2)(B).

c. "[L]ist on the contract market only contracts that are not readily susceptible to manipulation." 7 U.S.C. § 7(d)(3).

d. "[H]ave the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process through market surveillance, compliance, and enforcement practices and procedures, including—(A) methods for conducting real-time monitoring of trading; and (B) comprehensive and accurate trade reconstructions." 7 U.S.C. § 7(d)(4).

e. "[P]rovide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process…." 7 U.S.C. § 7(d)(9).

f. "[M]aintain rules and procedures to provide for the recording and safe storage of all identifying trade information in a manner that enables the contract market to use the information—(A) to assist in the prevention of customer and market abuses; and (B) to provide evidence of any violations of the rules of the contract market." 7 U.S.C. § 7(d)(10).

g. "[E]stablish and enforce—(A) rules and procedures for ensuring the financial integrity of transactions…and (B)…(ii) the protection of customer funds." 7 U.S.C. § 7(d)(11)

h. "[E]stablish and enforce rules—(A) to protect markets and market participants from abusive practices committed by any party…and (B) to promote fair and equitable trading on the contract market." 7 U.S.C. § 7(d)(12).

38.     The Commission has promulgated detailed rules governing the process through which a board of trade can achieve designation as a contract market, as well as detailed rules governing the operations of the contract market once that designation is in place. 17 C.F.R. § 38, *et seq.* DCMs may list for trading commodity futures, options, or swaps as permitted by Part 38 of the Commission's regulations, 17 C.F.R. § 38, *et seq.*

39.     The Commission regulates other actors who are targets of SF 4760. Clearing organizations that are registered with the Commission are known as Derivatives Clearing Organizations (DCOs) and governed by 17 C.F.R. Part 39. To comply with the Core Principle on financial integrity of transactions, clearing is required on all CFTC-regulated DCMs to reduce counterparty risk and to maintain orderly markets. 17 C.F.R. § 38.601.

40.     Likewise, many DCMs offer trades that are "intermediated" by a Futures Commission Merchant (FCM) that holds customer funds and solicits or accepts the customer orders for execution on the relevant DCM. DCMs that offer intermediated trades are required to prescribe minimum capital requirements for their member FCMs. 17 C.F.R. § 38.604.

41.     A number of other actors in CFTC-regulated commodity derivatives markets are targeted by SF 4760. "Introducing brokers" are persons engaged in soliciting or in accepting orders for, among other things, futures contracts or swaps traded on CFTC-regulated markets. 7 U.S.C. § 1a(31). Likewise, "commodity trading advisors" are persons who advise others as to the value or advisability of trading, among other things, futures

13

contracts or swaps on CFTC-regulated markets. *Id.* § 1a(12). "Commodity pool operators" solicit, accept, or receive funds from others for the purpose of trading, among other things, futures contracts or swaps on CFTC-regulated markets. *Id.* § 1a(11). "Swap dealers" are dealers, market makers, or counterparties in swaps. *Id.* § 1a(49).

42.     The National Futures Association ("NFA"), a registered futures association under Section 21 of the CEA, 7 U.S.C. § 21, is designated a Self-Regulatory Organization with delegated authority from the Commission. Performance of Registration Functions by National Futures Association, 49 Fed. Reg. 39,593 (Oct. 9, 1984). All FCMs and introducing brokers are required to register with the NFA. Both the CFTC and the NFA ensure these registrants are meeting, among other requirements, independent registration requirements, including net-capital requirements, imposed upon introducing brokers and FCMs by the CEA and CFTC Regulations.

43.     The CEA and CFTC Regulations establish important protections for derivatives markets, market participants, and the general public by creating uniform regulations of a nationwide—and often international—market. For example, DCMs must conform to core principles that are designed to achieve the prevention of market abuse (7 U.S.C. § 7(d)(12)(A)); ensure their financial stability (7 U.S.C. § 7(d)(21)); protect their information security (17 C.F.R. § 38.1051(a)(2)); and safeguard their systems in the event of a disaster (17 C.F.R. § 38.1051(a)(3)). Further, DCMs must ensure that the contracts that they list for trading are "not readily susceptible to manipulation" (7 U.S.C. § 7(d)(3)); DCMs must "prevent market disruption" (7 U.S.C. § 7(d)(4)); DCMs must impose position limits designed to reduce the potential threat of market manipulation or congestion (7

U.S.C. § 7(d)(5)); DCMs must establish and enforce rules to minimize conflicts of interest (7 U.S.C. § 7(d)(16)); DCMs must provide impartial access to traders (17 C.F.R. § 38.151); and DCMs must maintain and retain important records and provide them to the Commission (7 U.S.C. § 7(d)(18)). And the CEA conferred on the CFTC enforcement authority to "bring an action in . . . [a] district court . . . to enjoin . . . or to enforce compliance with [the CEA]" if "it shall appear to the Commission" that any "person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, or is restraining trading in any commodity for future delivery or any swap." 7 U.S.C. § 13a-1(a).

44.     Today there are 25 exchanges in the United States have active designations from the CFTC to operate as a contract market. These DCMs include providers of event contracts, whether they be recently designated markets (*e.g.*, Kalshi, Polymarket, and Gemini), or markets with longstanding designations (*e.g.*, CME Group).

**B. State Attempts to Shut Down National Markets Drives Early Derivatives Regulation**

45.     By the mid-nineteenth century, commodity exchanges in major trading hubs like New York and Chicago had organized trading to facilitate price discovery (information exchange), risk management (hedging), and speculation. But States and courts impeded these new markets, often failing to distinguish between futures trading and "gambling" or "wagering," with many states even prohibiting futures trading as a form of gambling. *See, e.g.*, *Irwin v. Williar*, 110 U.S. 499, 508–09 (1884) (describing futures contracts as "nothing more than a wager"); *see also Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888) (describing

15

futures as "gambling in grain").

46.    Indeed, in Minnesota, futures contracts were held to constitute wagers and were deemed void. *See, e.g., Mohr v. Miesen*, 49 N.W. 862 (Minn. 1891).

47.    Nevertheless, the Supreme Court and Congress acknowledged that futures markets served a valuable economic function and should be given room to develop. As Justice Holmes, writing for the Supreme Court, noted in *Board of Trade of Chicago v. Christie Grain & Stock Co.*, 198 U.S. 236, 247–48 (1905):

> People will endeavor to forecast the future, and to make agreements according to their prophecy. Speculation of this kind by competent men is the self-adjustment of society to the probable. Its value [is] well known as a means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want. It is true that the success of the strong induces imitation by the weak, and that incompetent persons bring themselves to ruin by undertaking to speculate in their turn. But legislatures and courts generally have recognized that the natural evolutions of a complex society are to be touched only with a very cautious hand, and that such coarse attempts at a remedy for the waste incident to every social function as a simple prohibition and laws to stop its being are harmful and vain.

48.    Congress, recognizing the value of these new markets and the negative effects of a patchwork of state regulation, centralized the oversight and regulation of futures trading on federally regulated contract markets. The first federal legislation designed to create a comprehensive federal regulatory framework for futures markets was the Future Trading Act of 1921, Pub. L. No. 67-66, 42 Stat. 187 (1921) ("21 Act"), followed by the Grain Futures Act of 1922, Pub. L. No. 67-331, 42 Stat. 998 (1922) ("22 Act"). In passing these laws, Congress recognized the importance of uniform federal regulation of futures markets, even over objections that the new legislation would displace some States' regulations. *Cf.* H.R. Rep. No. 67-1095, at 5 (1922) (Conf. Rep.) (objecting

16

that the bill was "designed to . . . more or less eliminate some of the most important police powers of several sovereign States"). Yet these early statutes did not make preemption complete, as the Supreme Court held that federal law "did not supersede any applicable provisions of [] Missouri law making gambling in grain futures illegal." *Dickson v. Uhlmann Grain Co.* 288 U.S. 188, 198 (1933).

49.     Congress expanded federal oversight of futures markets in 1936 with the Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491 (1936). But even as futures markets expanded beyond their agricultural origins, market participants continued to face the persistent threat of state regulation through a patchwork of state laws. The CEA, as it then existed, permitted state involvement in futures markets to at least some extent, as Section 4c of that Act provided that "nothing in this section or section 4b of the title shall be construed to impair any State law applicable to any transaction enumerated or described in such sections." 7 U.S.C. § 6c (1940). The Supreme Court held that this language "serves the function of preventing supersedure and preserving state control in two areas where state and federal law overlap." *Rice v. Board of Trade of City of Chicago*, 331 U.S. 247, 255 (1947).

### C. Congress Gave the CFTC "Exclusive" Jurisdiction over Futures Trading in 1974

50.     In 1973, futures exchanges recommended that "federal policy . . . be uniform throughout the United States" and not "subject to the vagaries" of different obligations in "different jurisdictions." Review of Commodity Exch. Act and Discussion of Possible Change: Hearings Before the H. Comm. on Agric.*,* 93d Cong., 1st Sess. 121 (1973).

17

Congress quickly responded, explicitly addressing the issue the following year when it passed the Commodity Futures Trading Commission Act of 1974, Pub. L. 93-463, 88 Stat. 1389 (1974) ("CFTC Act of 1974").

51.     With the passage of the CFTC Act of 1974, Congress amended the CEA to establish "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (quoting H.R. Rep. No. 93–975, at 1 (1974)).

52.     The CFTC Act of 1974 amendments to the CEA worked a sea change in the regulation of U.S. derivatives markets in three critical ways. First, Congress established the CFTC, vesting in this federal executive agency the authority to administer the CEA. Second, Congress expanded the scope of the CEA to cover all commodities. Third, Congress expressly gave the CFTC "exclusive jurisdiction" over U.S. commodity futures and options markets. *See* CFTC Act of 1974, § 201(b), 88 Stat. at 1395 (providing that "the Commission shall have exclusive jurisdiction with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option' . . . , and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to section 5 of this Act or any other board of trade, exchange, or market" (codified at 7 U.S.C. § 2(a)(1)(A)).

53.     Preemption was an express goal of the CFTC Act of 1974. Congress recognized the need for uniform, nationwide regulation of futures and options markets because concurrent regulation by the states or other federal regulators such as the Securities and Exchange Commission could lead to "total chaos." *See* Commodity Futures Trading

18

Act of 1974: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark). Section 4c, which preserved certain applications of state law from preemption, was stricken from the statute "to assure that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974) (Statement of Sen. Curtis). Thus, the CFTC Act of 1974 "preempt[ed] the field insofar as futures regulation is concerned" such that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." H.R. Rep. No. 93-1383 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897.

### D. Congress Reinforced and Clarified the CFTC's Exclusive Jurisdiction After 1974

54.     Amendments to the CEA between 1978 and 2010 repeatedly reinforced and clarified the Commission's exclusive jurisdiction over futures and options.

55.     In the Futures Trading Act of 1978 ("78 Act"), Congress preserved the Commission's exclusive authority over futures transactions on CFTC-regulated DCMs while clarifying the States' ability to pursue certain CEA violations against actors other than federally regulated exchanges. The 78 Act added a section to the CEA authorizing states to bring actions for injunctive or monetary relief for specified violations of the CEA and to enforce their "general civil or criminal antifraud" statutes. *See* 78 Act, Pub. L. 95-405, § 15(7), 92 Stat. 865, 873 (1978) (codified at 7 U.S.C. § 13a-2(7)). Other than this explicit authorization of state authority, the CEA retained the broad preemption of state laws put in place in 1974. Proposals to carve off pieces of the Commission's "exclusive"

19

jurisdiction were rejected, because "[t]he nature of the underlying commodity is not an adequate basis to divide regulatory authority." S. Rep. No. 95-850, at 111–12 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2110–11. That "a futures contract market does not fit into the traditional mold where there are both hedging and price-discovery functions should not be the determining factor in whether the contract is to be regulated by the CFTC." *Id.* Congress also further added to the list of justifications supporting the Commission's exclusive jurisdiction over commodity derivatives, citing concerns over "costly duplication and possible conflict of regulation or over-regulation." *Id.*

56.     The Futures Trading Act of 1982 (the "82 Act") further clarified the scope of the CEA's preemption of other federal and state laws and the role of the States in pursuing illegal or fraudulent off-exchange transactions, while still recognizing "the CFTC['s] exclusive jurisdiction to regulate futures trading and enforce the provisions of the Act, thereby preempting any State regulatory laws." H.R. Rep. No. 97-565, at 44–45 & 102–03 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3871, 3893–94 & 3951–52. First, the 82 Act clarified the procedures for States to pursue violations of the CEA's anti-fraud provisions in state court. Second, the 82 Act clarified the role of States with respect to off-exchange futures transactions. Language was added to permit the application of federal or state laws to *off-exchange* transactions or unregistered market participants. 82 Act, Pub. L. 97-444, § 229, 96 Stat. 2294, 2318 (1982). Other state laws that could arguably apply to DCMs and market participants registered with the CFTC remained preempted. *See* H.R. Rep. No. 97-565, at 44–45 & 102–103, 1982 U.S.C.C.A.N. at 3893–94, 3951–52. Congress explained that it "continue[d] to support the idea of a single unified program of regulation

and exclusive CFTC jurisdiction over exchange-traded futures," "recogniz[ing] the somewhat esoteric nature of the commodity futures markets and the desire to have knowledgeable and uniform enforcement of the Act." *Id.*

57.    In the Futures Trading Practices Act of 1992 ("92 Act"), Pub. L. 102-546, 106 Stat. 3590 (1992), Congress gave the Commission authority to "exempt" certain off-exchange ("over-the-counter" or "OTC") derivatives transactions from the CEA's mandatory exchange-trading regime. Unlike the 82 Act, the 1992 Congress preempted the application of state or local gambling or bucket shop laws as applied to certain off-exchange derivative transactions exempted by the Commission. *Id.* § 502(c), 106 Stat. 3631; *see also* Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, Appendix E, § 117, 114 Stat. 2763A-365, 2763A-402–03 (2000).

### E.  Congress Embraced Preemption for Swap Transactions in the Dodd-Frank Act

58.    In the wake of the 2008 financial crisis, Congress reworked the regulatory structure for the "swaps" market, creating a framework within the CEA for the on-exchange execution, clearing, and reporting of vast portions of those swaps. The 2010 Dodd-Frank Act expressly extended the Commission's "exclusive jurisdiction" to encompass "accounts, agreements . . . , and transactions involving swaps" traded on DCMs and swap execution facilities. *See* Pub. L. No. 111-203, 124 Stat. 1376 (2010); 7 U.S.C. § 2(a)(1)(A).

59.    In the Dodd-Frank Act, Congress made clear that the Commission has exclusive jurisdiction over event contracts. In CEA § 5c(c)(5)(C) (codified at 7 U.S.C.

§ 7a-2(c)(5)(C)), Congress created a "Special Rule" that provides the Commission with specific oversight and prohibitory authority over event contracts. Specifically, the Special Rule states that the CFTC "may determine" that event contracts involving certain activities "are contrary to the public interest" and may not be listed on CFTC-regulated markets. 7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii).

60.     By creating a specific public-interest review process, Congress signaled that these contracts fall within the Commission's exclusive regulatory purview, not the States'.

**F. The Commission Uses Its Authority to Carry Out Congress's Directives**

61.     The CEA confers on the Commission the authority to make rules governing swaps and other futures and derivatives contracts. See, *e.g.*, 7 U.S.C. §§ 2, 6, 6s, 7. Pursuant to that authority, the Commission has for decades promulgated rules that regulate a large, nationwide industry and which seek to provide clarity to the industry, market participants, and the public. See 17 C.F.R. § 1.1, *et seq*.

62.     Part of the Commission's responsibilities include issuing guidance and promulgating new rules to provide certainty when markets change and innovate. The CFTC already has extensive rules on what a DCM must do to become certified with the Commission, *see* 17 C.F.R. Part 38, and what a DCM must do to either self-certify a contract before listing, *see* 17 C.F.R. § 40.2, or to submit a contract for the Commission to approve, *see* 17 C.F.R. § 40.3.

63.     The CEA's layered oversight approach also requires DCMs to serve as the first line of defense in policing their markets. Before listing an event contract for trade, a

DCM must provide the Commission with information including the contract's rules, "a concise explanation and analysis" of the contract's "terms and conditions," and "a certification . . . that the product to be listed complies with the [CEA] and [CFTC] regulations." 17 C.F.R. § 40.2(a)(3). The Commission can also require DCMs to turn over "evidence, information or data" proving compliance with the CEA. *Id.* § 40.2(b). If a DCM fails to provide this information or offers a "false certification," the Commission "may stay the listing of a contract." *Id.* § 40.2(c).

64.     With respect to event contracts, the Commission recently published an advisory letter to DCMs on prediction markets and event contracts, Prediction Markets Advisory, CFTC Letter No. 26-08 (Mar. 12, 2026) (*see* CFTC Prediction Markets Advisory Press Release, https://www.cftc.gov/PressRoom/PressReleases/9193-26 (Mar. 12, 2026)).

65.     To provide additional clarity in the marketplace, the Commission is in the process of writing and revising its rules applicable to event contracts and prediction markets. On March 16, 2026, the CFTC published in the Federal Register an advance notice of proposed rulemaking soliciting public comments on prediction markets. 91 Fed. Reg. 12516 (Mar. 16, 2026).

66.     The CFTC also pursues enforcement actions against market participants who violate the CEA or CFTC regulations in trading event contracts. For example, the Commission recently filed a civil enforcement action against a U.S. servicemember who used sensitive nonpublic information to trade event contracts related to the ouster of Venezuelan President Nicolás Maduro. *See Commodity Futures Trading Commission v. Van Dyke*, No. 1:26-cv-3369 (S.D.N.Y.).

23

67.     The CFTC has also executed a Memorandum of Understanding with Major League Baseball that provides a mechanism for the two entities to exchange information, allowing both to swiftly respond to incidents on prediction markets and anticipate emerging trends.[1] The CFTC is also in discussions with other professional sports leagues to promote market integrity.

## V.   MINNESOTA ENACTS A LAW TARGETING SWAPS THAT TRADE ON CFTC-REGISTERED DESIGNATED CONTRACT MARKETS

68.     On May 18, 2026, Minnesota enacted SF 4760. Article 8 of that law creates Minnesota Stat. § 609.7615 and amends § 299L.03(12) and § 609.75.

69.     The new statutory language overrides a long-standing carve-out of CFTC-regulated products from the statutory definition of "bet" in Minnesota. Prior to SF 4760, Minnesota gambling law provided that "a contract for the purchase or sale at a future date of securities or other commodities" was not a "bet." Minn. Stat. § 609.75. This language clarified that "[t]rading commodities futures does not constitute gambling." *ACLI Int'l Commodity Servs., Inc. v. Lindwall*, 347 N.W.2d 522, 524–25 (Minn. Ct. App. 1984). Now, the law provides that "a contract for the purchase or sale at a future date of securities or other commodities" is not a "bet," "*except as provided in Section 609.7615.*" Minn. Stat. § 609.75 (as amended) (emphasis added). On its face, therefore, the law makes clear that it is targeting commodity futures contracts.

70.     The provisions of § 609.7615 are incredibly sweeping. The law defines a

---

[1]     CFTC, Release Number 9199-26 (Mar. 19, 2026), https://www.cftc.gov/PressRoom/PressReleases/9199-26.

"prediction market" as a "system that allows consumers to place a wager on the future outcome of a specified event that is not determined or affected by the performance of the parties to the contract," and then lists inclusive events such as "short-term weather events," "any event or events happening to a natural person or group of people," and "the actions or conduct of the federal, state, or local government and the government's agencies, employees, and officers." Minn. Stat. § 609.7615(1)(e)(4), (5), (8).

71.    As early as the 1990s, CFTC-regulated DCMs including the Chicago Board of Trade and the Chicago Mercantile Exchange were offering futures and options on crop yields[2] and weather,[3] including "temperature volatilities."[4] Now, however, under the new amendments to the Minnesota gambling law, such contracts would be considered "wagers," and federally regulated exchanges could be subject to criminal liability for offering a "prediction market" based on "short-term weather events or conditions" or "any event or events happening to a natural person or group of people." Minn. Stat. § 609.7615.

---

[2] *See, e.g.*, CFTC, Designated Contract Market Product: 737, North Dakota Spring Wheat Yield Insurance Future and Option on a Future, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/737; CFTC, Designated Contract Market Product: 736, North Dakota Spring Wheat Yield Insurance, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/736.

[3] *See, e.g.*, CFTC Designated Contract Market Products: 1051, Degree Days Index, Des Moines, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/1051; CFTC Designated Contract Market Products: 1037, Degree Days Index, Des Moines, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/1037.

[4] "Since 1992, Commission-regulated exchanges have listed for trading a variety of commodity futures and options contracts with payout terms based on" events "as diverse as regional insured property losses, the count of bankruptcies, temperature volatilities, corporate mergers, and corporate credit events." 73 Fed. Reg. 25669, 25671 (May 7, 2008).

25

72.     Section 609.7615 targets other CFTC-regulated products that have long been offered on CFTC-designated platforms. For example, the law targets event contracts about "the actions or conduct of the federal, state, or local government and the government's agencies, employees, and officers." Minn. Stat. § 609.7615(1)(e)(5). This could include derivatives based on the issuance of government reports, such as the Bureau of Labor Statistics' reporting of the Consumer Price Index or unemployment rate,[5] as well as official government action such as the target Federal Funds rate. The law also takes aim at contracts on elections, *id.*, which trade on CFTC-regulated markets and which the Commission has overseen since 1993.[6] And it criminalizes "events in popular culture," even though contracts about "the length of celebrity marriages" have traded since 2005.[7]

73.     The law also targets contracts that, according to the Special Rule, the CFTC has authority to approve or disapprove if contrary to the public interest. These contracts include "terrorism," "assassination," "war," and "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii). The Minnesota law expressly targets all of these event contracts, *see* Minn. Stat. § 609.7615(1)(e)(2), (3), (7), usurping the Commission's role as the determiner of whether such contracts should be prohibited from listing to the extent they are contrary to the public

---

[5] CFTC, Designated Contract Market Products: 58528, Event Contracts on Consumer Price Index - Urban All Items (CPI - U), https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/58528.

[6] CFTC, Designated Contract Market Products: 60523, Additional Event Contract Swaps on U.S. Elections, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/60523; *see* CFTC Staff Letter No. 93-66 (June 18, 1993), https://www.cftc.gov/sites/default/files/idc/groups/public/@lrlettergeneral/documents/letter/93-66.pdf (no-action letter to Iowa Electronic Markets).

[7] 73 Fed. Reg. 25669, 25670 (May 7, 2008).

interest.

74.     The law also targets contracts on sports events,[8] which trade on CFTC-regulated markets and which courts have held are subject to the CFTC's exclusive jurisdiction. *See, e.g.*, *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 228–29 (3d Cir. 2026).

75.     Minnesota has not only targeted a sweeping range of event *contracts*; it would make felons of a sweeping range of *persons*.

76.     The law first targets those who "create[] a prediction market." Minn. Stat. § 609.7615(2)(1). This would criminalize the operations of DCMs who have been approved by the Commission to list event contracts and who self-certify their event contracts to the Commission.

77.     The law targets persons who "operate[], manage[], or control[] a platform or system intending that consumers will use the platform or system to make wagers in a prediction market." Minn. Stat. § 609.7615(2)(2). This could turn Commission-regulated Futures Commission Merchants (FCMs) into felons, because their platforms perform an intermediary function connecting consumers to event contracts listed on DCMs.

78.     Next, the law prohibits "intentionally facilitat[ing] the operation of a prediction market" by various means, including by "accepting, holding, or directing the disposition of money or other things of value for the purpose of allowing consumers to make wagers or to settle wagers made by consumers." Minn. Stat. § 609.7615(2)(3), (3)(ii).

---

[8] *See* CFTC, Designated Contract Market Products: 60528, Additional Event Contract Swaps on International Soccer, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/60528.

27

Likewise, the law prohibits a person from "provid[ing] supportive services to a prediction market or consumer knowing that the services will be used to . . . transfer money, or make or process payments for the purpose of allowing consumers to make wagers or to settle wagers." Minn. Stat. § 609.7615(2)(5). These provisions could impose criminal liability on Derivatives Clearing Organizations, who are registered with the CFTC for the purpose of clearing and settling trades on DCMs. They could also apply to financial institutions, including banks or credit-card companies, to the extent they transfer funds between consumers and prediction markets.

79.    The law also prohibits the intentional facilitation of prediction markets by "identifying or listing events knowing the events will be used by consumers to make wagers." Minn. Stat. § 609.7615(2)(3)(i). That could conceivably apply to any webpage, television network, or newspaper that lists events that are the subject of trading on prediction markets. Major news outlets in the United States—including CNBC, CNN, Fox Corporation, and Dow Jones—have partnerships with prediction markets, and thus face potential liability in Minnesota for displaying prediction-market data.[9]

80.    The law makes it a felony to "provide[] data, information, or verification services, including the provision of event outcomes, directly to a prediction market knowing that the data, information, or verification services will be used to allow consumers

---

[9] N. Miller, *Fox to Integrate Kalshi Prediction-Market Data in Coverage* (Apr. 7, 2026), https://www.marketwatch.com/story/fox-to-integrate-kalshi-prediction-market-data-in-coverage-f6ced46e?eafs_enabled=false; Dow Jones, *Polymarket and Dow Jones, Publisher of The Wall Street Journal, Announce Exclusive Prediction Market Partnership* (Jan. 7, 2026), https://www.dowjones.com/press-room/polymarket-and-dow-jones-publisher-of-the-wall-street-journal-announce-exclusive-prediction-market-partnership/.

28

to make wagers or to settle wagers made by consumers." Minn. Stat. § 609.7615(2)(4). This could apply to news organizations, sports leagues, and their data distributors who have contracts to provide information to prediction markets. The Associated Press, for example, has agreed to "provide Kalshi with its vote count data and race calls for national and major state elections."[10] The National Hockey League "provides Polymarket and Kalshi with access to official NHL proprietary data."[11] And Major League Baseball agreed to provide Polymarket with "access to Official League Data from Sportradar, MLB's exclusive global distributor of data for prediction markets."[12] All these are potential subjects of criminal prosecution in Minnesota.

81.    Minnesota's law is not only enforceable by prosecution. The Director of the Alcohol and Gambling Enforcement Division within the Minnesota Department of Public Safety has authority to issue a cease-and-desist order whenever a person has engaged in or is about to engage in an act or practice in violation of § 609.7615. Minn. Stat. § 299L.03(12)(a). The Director can also bring an action in state court, and if the Director prevails, the court must issue an injunction, restraining order, or writ of mandamus. Minn.

---

[10] AP Corporate Communications, *AP to Provide Kalshi Its Gold Standard Elections Data Ahead of Primaries* (Mar. 2, 2026), https://www.ap.org/media-center/press-releases/2026/ap-to-provide-kalshi-its-gold-standard-elections-data-ahead-of-primaries/.

[11] NHL Public Relations, *NHL Announces Landmark Multiyear Partnerships with Kalshi, Polymarket* (Oct. 22, 2025), https://www.nhl.com/news/nhl-announces-landmark-multiyear-partnerships-with-kalshi-polymarket.

[12] MLB, *MLB names Polymarket exclusive Prediction Market Exchange partner and signs agreement with CFTC to establish integrity framework* (Mar. 19, 2026), https://www.mlb.com/press-release/press-release-mlb-names-polymarket-exclusive-prediction-market-exchange-partner-and-signs-agreement-with-cftc-to-establish-integrity-framework.

29

Stat. § 299L.03(12)(b).

82. Defendants' criminalization of the conduct of CFTC-regulated various CFTC-regulated entities, as well as those affiliated or interacting with those entities, interferes with Plaintiffs' exclusive jurisdiction over swaps. The entire point of the CEA is to create a uniform and predictable nationwide market for futures trading, and the Commission oversees that market via its certification process of DCMs and its requirements for DCMs to comply with the self-certification or submission-certification requirements before listing event contracts. Defendants' newly enacted law undermines that uniformity, thwarts Congress's scheme, and intrudes on the Commission's exclusive jurisdiction. Defendants' law also makes it much more difficult for the Commission to regulate, advise, and enforce its authority over DCMs, FCMs, DCOs, and other intermediaries, wasting resources and subverting Commission's congressionally mandated authority.

83. Every step Defendants take toward enforcing preempted state law against the Commission's regulated entities causes additional disruption to the markets exclusively regulated by the Commission and thus causes irreparable harm to the Commission's exclusive jurisdiction, authority, and operations. Incremental enforcement steps send mixed signals to this interconnected market, disrupting their operations. DCMs, FCMs, and DCOs are forced to guess whether they are held to the standards of the CFTC and CEA, state regulators, or both. Criminal laws discourage—if not kill altogether—DCM, FCM, DCO, and intermediary participation in the market, given the seriousness of potential liability. Criminal laws also obfuscate the proper regulatory framework, improperly alter

30

risk tolerances, and cause unnecessary expense to both market participants and the Commission. This frustrates the purpose of the CEA to serve the public interest via a system of effective self-regulation of trading facilities, clearing systems, market participants, and market professionals under the Commission's oversight.

84.     Because Congress granted the CFTC "exclusive authority" over the transactions traded or executed on DCMs, it is not equipped to manage markets that are subject both to the CEA and to a patchwork of state regulations. As a result, Defendants' actions undermine CFTC's authority and require additional agency resources to engage in regulatory oversight of these DCMs, FCMs, and DCOs.

## VI.     THE CHALLENGED MINNESOTA STATUTE IS PREEMPTED

85.     The Constitution's Supremacy Clause mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

86.     The CEA, as continuously refined over more than a century, gives the CFTC "exclusive jurisdiction" over futures and swaps traded on a DCM. 7 U.S.C. § 2(a)(1)(A). The CEA "preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). "[P]reemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of a futures market.'" *Effex Cap., LLC v. National Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (quoting *American Ag. Movement v. Board of Trade of Chi.*, 977 F.2d 1147, 1156-57 (7th Cir. 1992)).

87.     "[U]nder the Supremacy Clause, from which our pre-emption doctrine is

31

derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (internal citation omitted). "Congress can preempt state law in one of three ways: (1) expressly though statutory language like a preemption clause; (2) implicitly when a state law conflicts with or stands as an obstacle to federal law; or (3) implicitly by occupying a legislative field, leaving no room for state law." *WinRed, Inc. v. Ellison*, 59 F.4th 934, 941 (8th Cir. 2023) (citation modified).

88.    "Express preemption exists where Congress uses explicit pre-emptive language to express its purpose." *In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Pracs. Litig.*, 621 F.3d 781, 792 (8th Cir. 2010) (citation omitted). Congress explicitly preempted state regulation of commodity derivatives transactions by vesting the Commission with "exclusive jurisdiction" over all "accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a [DCM]." 7 U.S.C. § 2(a)(1)(A). Congress therefore preempted state regulation of transactions subject to the CFTC's "exclusive jurisdiction," including swaps, the DCMs that list them, the DCOs that clear them, and any intermediaries to the transactions who may also hold the accounts. The event contracts targeted by Minnesota law are "swaps," and thus, the Commission's exclusive jurisdiction precludes Minnesota from regulating or prohibiting them.

89.    Even without the express language of the CEA preempting state regulation, any state interference with transactions traded on a DCM is preempted because Congress occupied the field of commodity regulation "so comprehensively that it has left no room

32

for supplementary state legislation." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 228–29 (3d Cir. 2026) (citation omitted). As the scope of the CEA and the long history of amendments to it make clear, Congress created "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982). And it vested "exclusive jurisdiction" to administer that structure—particularly in regard to swaps traded on DCMs—with the Commission. 7 U.S.C. § 2(a)(1)(A). "Congress's intent was to provide the CFTC with exclusive jurisdiction to regulate commodities" and "[s]uch exclusive jurisdiction precludes states from exercising supplementary regulatory authority over commodity transactions." *Stuber v. Hill*, 170 F. Supp. 2d 1146, 1151 (D. Kan. 2001). States therefore cannot prohibit, regulate, or otherwise undermine the offering of event contracts on DCMs.

90.     There are also numerous direct conflicts between federal law and Minnesota law. CFTC regulations require DCMs to provide "impartial access" to all eligible participants nationwide. 17 C.F.R. § 38.151(b). Minnesota's law would require DCMs to violate that rule by forcing them to deny event contracts to Minnesotans under pain of criminal liability.

91.     The CEA also requires swap transactions to be cleared through a derivatives clearing organization (DCO) registered with the Commission. 7 U.S.C. § 2(h)(1); 17 C.F.R. § 38.601(a) ("Transactions executed on or through the [DCM] must be cleared through a Commission-registered derivatives clearing organization."). The Commission has accordingly licensed various DCOs to clear transactions for DCMs that provide event

33

contracts.[13] But Minnesota law makes it a crime for a DCO to clear event-contract transactions—specifically, by making it a felony to "intentionally facilitate[] the operation of a prediction market by . . . directing the disposition of money . . . to settle wagers made by consumers," Minn. Stat. § 609.7615(2)(3)(ii), or to "provide supportive services [used to] transfer money . . . for the purpose of . . . settl[ing] wagers," *id.* § 609.7615(2)(5). Thus, there is no way to clear an event contract in compliance with federal law without requiring a DCO to commit a Minnesota criminal offense—a direct conflict between state and federal law that requires state law to give way.

92.     Minnesota law also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (internal citation omitted). If States can criminalize the offering of event contracts by DCMs, then DCMs would face the prospect of 50 regulators across the country, which defeats Congress's design of centralizing derivatives regulation under the Commission. This is equally true for DCOs and any intermediaries. Moreover, the numerous facilitation and advertising crimes that Minnesota has created would undermine the orderly operation of CFTC-regulated markets, and allowing these provisions to go into effect would significantly disrupt the operation of commodity futures markets governed by the CEA.

93.     Therefore, the CEA preempts state laws that purport to prohibit, limit, or condition the listing or trading of event contracts on CFTC-regulated DCMs.

---

[13]     CFTC, Derivative Clearing Organizations (DCO), https://www.cftc.gov/IndustryOversight/IndustryFilings/ClearingOrganizations?Status=Registered&Date_From=&Date_To=&Show_All=1.

## VII.   CLAIM FOR RELIEF

## COUNT I – United States Constitution, Art. VI, cl. 2 (Supremacy Clause)

94.   The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

95.   The United States has a cause of action in equity to sue to enjoin a state law's implementation and enforcement of a law that violates the Supremacy Clause. *United States v. Missouri*, 114 F.4th 980, 986 (8th Cir. 2024).

96.   The event contracts targeted by Minn. Stat. § 299L.03(12), § 609.75(2), and § 609.7615 (as amended by SF 4760, Article 8) are swaps as defined by the CEA. *See* 7 U.S.C. §1a(47)(A).

97.   The "prediction markets" targeted by Minn. Stat. § 299L.03(12), § 609.75(2), and § 609.7615 (as amended by SF 4760, Article 8) are designated contract markets that are registered, monitored, and regulated by the Commission.

98.   The CEA confers upon the Commission "exclusive jurisdiction" over "accounts, agreements . . . and transactions involving swaps . . . traded or executed on a [DCM]." 7 U.S.C. § 2(a)(1)(A). The CEA otherwise creates a comprehensive regulatory structure for overseeing swaps traded on DCMs, which the Commission is charged by Congress with administering.

99.   Minn. Stat. § 609.7615 and the amendments to Minn. Stat. § 299L.03(12) and § 609.75(2) are expressly preempted by the CEA.

100.   Minn. Stat. § 609.7615 and the amendments to Minn. Stat. § 299L.03(12) and § 609.75(2) are field preempted by the CEA.

35

101. Minn. Stat. § 609.7615 and the amendments to Minn. Stat. § 299L.03(12) and § 609.75(2) are conflict preempted by the CEA. Compliance with both state and federal law is impossible and state law stands as an obstacle to the full accomplishment of Congress's stated objectives and purposes.

## VIII.   RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the following relief:

A. That this Court enter a judgment declaring that Minn. Stat. § 609.7615 and the amendments to Minn. Stat. § 299L.03(12) and § 609.75(2)—or any other Minnesota state laws pertaining to betting, gambling or wagering as applied to transactions listed, offered, or executed on CFTC-regulated DCMs—violate the Supremacy Clause and are therefore preempted, unconstitutional, and invalid;

B. That this Court issue a preliminary and permanent injunction that prohibits Defendants as well as their successors, agents, and employees, from investigating for or enforcing Minn. Stat. § 609.7615 and the amendments to Minn. Stat. § 299L.03(12) and § 609.75(2), or any other state laws pertaining to betting, gambling, or wagering as applied to transactions listed, offered, or executed on CFTC-regulated DCMs;

C. That this Court award Plaintiffs their costs and fees in this action; and

D. That this Court award any other relief it deems just and proper.

Dated: May 19, 2026                          Respectfully submitted,

By: */s/ Perry Sekus*                        */s/ M. Jordan Minot*


*Attorneys for the United States of*         *Attorneys for the Commodity Futures*
*America*                                    *Trading Commission*

PERRY SEKUS                                  TYLER S. BADGLEY
Assistant U.S. Attorney                      General Counsel
U.S. Attorney's Office for the               M. JORDAN MINOT
District of Minnesota, Civil Division        Deputy General Counsel
300 S. 4th Street, Suite 600                 (*pro hac vice forthcoming*)
Minneapolis, MN 55415                        HENRY J. DICKMAN
Tel. 612-664-5600                            Senior Assistant General Counsel
perry.sekus@usdoj.gov                        (*pro hac vice forthcoming*)
                                             ANNE STUKES
BRETT A. SHUMATE                             Senior Assistant General Counsel
Assistant Attorney General                   (*pro hac vice forthcoming*)
Civil Division                               CARLIN METZGER
                                             Senior Assistant General Counsel
YAAKOV M. ROTH                               (*pro hac vice forthcoming*)
Principal Deputy Assistant Attorney          ANDREW J. WEISBERG
General                                      Senior Assistant General Counsel
                                             (*pro hac vice forthcoming*)
TIBERIUS DAVIS
Counsel to the Assistant Attorney General    U.S. Commodity Futures Trading
450 5th Street, N.W.                         Commission
Washington, DC 20001                         Three Lafayette Centre
Tel. 202-860-8970                            1155 21st Street, N.W.
tiberius.davis@usdoj.gov                     Washington, DC 20581
                                             Tel. (202) 209-1087
ALEXANDRA McTAGUE SCHULTE                    tbadgley@cftc.gov
Senior Litigation Counsel                    jminot@cftc.gov
Tel. 202-718-0483                            hdickman@cftc.gov
alexandra.schulte@usdoj.gov                  astukes@cftc.gov
                                             cmetzger@cftc.gov
                                             aweisberg@cftc.gov

37