**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| THE UNITED STATES OF AMERICA and COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF MINNESOTA; TIM WALZ, in his official capacity as Governor of Minnesota; KEITH ELLISON, in his official capacity as Attorney General of Minnesota; MINNESOTA DEPARTMENT OF PUBLIC SAFETY; JON ANGLIN, in his official capacity as Director of the Minnesota Department of Public Safety, Alcohol and Gambling Enforcement Division,<br><br>Defendants. | Case No. 0:26-cv-02661<br><br>**EXPEDITED HANDLING REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**AMENDED MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ....................................................................................................... 3

I.   The CEA provides the regulatory framework for commodity derivatives
     markets in the United States, including event-contract markets ................................. 3

II.  Congress has steadily expanded the Commission's jurisdiction
     and contracted state jurisdiction over derivatives trading ........................................... 5

III. Event contracts have long traded subject to Commission oversight .......................... 8

IV.  Minnesota attempts to criminally ban event contracts traded on
     CFTC-regulated derivatives markets ......................................................................... 10

LEGAL STANDARD ............................................................................................... 11

ARGUMENT ........................................................................................................... 12

I.   Plaintiffs have standing .............................................................................................. 12

II.  Plaintiffs are likely to succeed in establishing that federal law preempts SF
     3432 ............................................................................................................................ 15

     A.   Minnesota seeks to criminalize "swaps" under the CEA ................................. 16

     B.   SF 3432 is preempted by federal law ............................................................... 21

          1.   The CEA expressly preempts state regulation of commodity
               derivatives transactions ........................................................................... 21

          2.   The CEA occupies the field of regulating trading on a DCM .................. 24

          3.   SF 3432 conflicts with the CEA and Commission Rules ......................... 26

III. The remaining factors favor granting preliminary relief ........................................... 29

CONCLUSION ........................................................................................................ 32

i

# TABLE OF AUTHORITIES

<u>Cases</u>

*ACLI International Commodity Services., Inc. v. Lindwall,*
  347 N.W.2d 522 (Minn. Ct. App. 1984) ............................................................ 19

*Alabama Power Co. v. Costle*,
  636 F.2d 323 (D.C. Cir. 1979) ........................................................................... 18

*American Agriculture Movement, Inc. v. Board of Trade of Chicago*,
  977 F.2d 1147 (7th Cir. 1992) ....................................................................... 28, 29

*Arizona v. United States,*
  567 U.S. 387 (2012) ............................................................................... 13, 21, 24

*Atlantic Richfield Co. v. Christian*,
  590 U.S. 1 (2020) ............................................................................................... 24

*Cargill, Inc. v. Hardin,*
  452 F.2d 1154 (8th Cir. 1971) ............................................................................. 4

*Carson v. Milwaukee Produce Co.,*
  113 N.W. 393 (Wis. 1907) .................................................................................... 5

*Chamber of Com. of U.S. v. Whiting,*
  563 U.S. 582 (2011) ........................................................................................... 21

*Christensen Hatch Farms, Inc. v. Peavey Co.,*
  505 F. Supp. 903 (D. Minn. 1981) .................................................................... 22

*Churchill Downs Technology Initiatives Co. v. Michigan Gaming Control Board,*
  162 F.4th 631 (6th Cir. 2025) ........................................................................... 30

*Cigna Corp. v. Bricker,*
  103 F.4th 1336 (8th Cir. 2024) ......................................................................... 29

*Cohn v. Brinson,*
  73 So. 59 (Miss. 1916) .......................................................................................... 5

*Commodity Futures Trading Commission v. Spagnuolo*,
  No. 1:26-cv-4419 (S.D.N.Y.) ............................................................................... 9

*Commodity Futures Trading Commission v. Van Dyke*,
  No. 1:26-cv-3369 (S.D.N.Y.) ......................................................................... 9, 31

*Cothran v. Ellis*,
  16 N.E. 646 (Ill. 1888) .......................................................................................... 5

*Cunningham v. National Bank of Augusta,*
  71 Ga. 400 (1883) ................................................................................................. 5

*Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    622 F.2d 216 (6th Cir. 1980) ................................................................... 21

*Department of Commerce v. New York,*
    588 U.S. 752 (2019) ................................................................................ 14

*Dickson v. Uhlmann Grain Co.*,
    288 U.S. 188 (1933) ................................................................................. 6

*Effex Capital, LLC v. National Futures Ass'n*,
    933 F.3d 882 (7th Cir. 20190 ............................................................ 22, 25

*Eggers v. Evnen*,
    48 F.4th 561 (8th Cir. 2022) ................................................................... 11

*FTC v. Ken Roberts Co.*,
    276 F.3d 583 (D.C. Cir. 2001) .................................................................. 6

*Hughes v. Talen Energy Mktg., LLC*,
    578 U.S. 150 (2016) ................................................................................ 21

*KalshiEX, LLC v. Flaherty*,
    172 F.4th 220 (3d Cir. 2026) ............................................................ *passim*

*KalshiEX LLC v. Johnson*,
    2026 WL 1223373 (D. Ariz. May 5, 2026) ........................................ *passim*

*KalshiEX LLC v. Martin*,
    793 F. Supp. 3d 667 (D. Md. 2025) ......................................................... 23

*KalshiEX v. Orgel*,
    2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) ................................ 2, 18, 30

*Kansas v. Garcia*,
    589 U.S. 191 (2020) ................................................................................ 24

*Leist v. Simplot*,
    638 F.2d 283 (2d Cir. 1980) .................................................................... 22

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................ 12

*Merrill Lynch Int'l v. XL Cap. Assur. Inc.*,
    564 F. Supp. 2d 298 (S.D.N.Y. 2008) ..................................................... 24

*Merrill Lynch, Pierce, Ferner & Smith, Inc. v. Curran*,
    456 U.S. 353 (1982) ......................................................................... *passim*

*Minnesota Chapter of Associated Builders & Contractors, Inc. v. Blissenbach*,
    155 F.4th 1015 (8th Cir. 2025) ................................................................ 14

*Mohr v. Miesen*,
    49 N.W. 862 (Minn. 1891) ........................................................................ 5

iii

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992) ....................................................................................... 30

*Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
  78 F.4th 1011 (8th Cir. 2023) ......................................................................... 29

*Murphy v. National Collegiate Athletic Association,*
  584 U.S. 453 (2018) ....................................................................................... 24

*Pharmaceutical Research & Manufacturers of America v. McClain,*
  95 F.4th 1136 (8th Cir. 2024) ......................................................................... 26

*Rice v. Board of Trade of Chicago,*
  331 U.S. 247 (1947) ......................................................................................... 6

*Rumsey v. Berry,*
  65 Me. 570 (1876) ............................................................................................ 5

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ....................................................................................... 12

*Stuber v. Hill*,
  170 F. Supp. 2d 1146 (D. Kan. 2001) ............................................................ 25

*Texas Midstream Gas Servs., LLC v. City of Grand Prairie*,
  608 F.3d 200 (5th Cir. 2010) ......................................................................... 29

*Thrifty Oil Co. v. Bank of Am. National Tr. & Sav. Ass'n*,
  322 F.3d 1039 (9th Cir. 2003) ....................................................................... 23

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012) ................................................................ 29, 30

*United States v. California*,
  173 F.4th 1060 (9th Cir. 2026) ...................................................................... 29

*United States v. Florida*,
  172 F.4th 1201 (11th Cir. 2026) .................................................................... 13

*United States v. Iowa*,
  126 F.4th 1334 (8th Cir. 2025),
  *vacated as moot* 2005 WL 1140834 (8th Cir. Apr. 15, 2025) ................... 13, 15

*United States v. Missouri*,
  114 F.4th 980 (8th Cir. 2024) ..................................................................... 12, 13

*United States v. Phillips*,
  155 F.4th 102 (2d Cir. 2025) .......................................................................... 16

*United States v. South Carolina*,
  720 F.3d 518 (4th Cir. 2013) .......................................................................... 13

*United States v. Texas*,
  97 F.4th 268 (5th Cir. 2024) ............................................................................. 15

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,
  529 U.S. 765 (2000) .......................................................................................... 13

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7 (2008) .............................................................................................. 11

<u>Statutes</u>

7 U.S.C. § 1a(9), CEA § 1a(9) ............................................................................. 20

7 U.S.C. § 1a(19), CEA § 1a(19) ......................................................................... 20

7 U.S.C. § 1a(47)(A), CEA § 1a(47)(A) .................................................... 7, 16, 17, 18, 20

7 U.S.C. § 2(a)(1), CEA § 2(a)(1) ................................................................. *passim*

7 U.S.C. § 2(h)(1) ................................................................................................ 27

7 U.S.C. § 5, CEA § 3 ........................................................................................... 4

7 U.S.C. § 7, CEA § 5 ........................................................................................... 4

7 U.S.C. § 7a-2(c)(1), CEA § 5c(c)(1) ................................................................. 25

7 U.S.C. § 7a-2(c)(5)(C), CEA § 5c(c)(5)(C) ............................................ 7, 18, 19, 26

7 U.S.C. § 13a-2(1), CEA § 6d(1) .................................................................. 22, 23

7 U.S.C. § 13a-2(7), CEA § 6d(7) ....................................................................... 22

7 U.S.C. § 16(e), CEA § 12(e) ............................................................................. 23

7 U.S.C. § 16(h), CEA § 12(h) ............................................................................. 24

Commodity Futures Trading Commission Act of 1974,
  Pub. L. No. 93-463, 88 Stat. 1389 (1974) ........................................................... 6

Dodd-Frank Wall Street Reform and Consumer Protection Act,
  Pub. L. No. 111-203, 124 Stat. 1376 (2010) ....................................................... 7

Minn. Stat. § 299L.03(12) .................................................................................... 11

Minn. Stat. § 609.75 ....................................................................................... 11, 19

Minn. Stat. § 609.7615 .............................................................................. *passim*

Regulations

17 C.F.R. § 38.150(a)..................................................................................................5

17 C.F.R. § 38.151(b) ...............................................................................................27

17 C.F.R. § 38.200 .....................................................................................................5

17 C.F.R. § 38.250 .....................................................................................................5

17 C.F.R. § 38.601(a)................................................................................................27

17 C.F.R. § 40.11(c)(2) .............................................................................................26

Concept Release on the Appropriate Regulatory Treatment of Event Contracts,
   73 Fed. Reg. 25,669 (May 7, 2008)........................................................................8

Prediction Markets,
   91 Fed. Reg. 12,516 (proposed Mar. 16, 2026).....................................................9

Legislative Materials

120 Cong. Rec. S 30458, 30464 (Sept. 9, 1974) ..............................................7, 25

Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric. &
Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974)
(statement of Sen. Clark)..........................................................................................28

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.),
   *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897..................................................7, 25

S. Rep. No. 93-1131 (1974).........................................................................................7

S. Res. 708, 119th Cong. (2026) ...............................................................................16

Other Authorities

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*,
   58 Chicago-Kent L. Rev. 657, 670 (1982).  .........................................................6

William W. Mansfield, *A Digest of the Statutes of Arkansas* § 1848
   (U.M. Rose ed., 1884) ..............................................................................................5

Sen. John Marty, *Minnesota Senate Passes Legislation to Ban Prediction Markets*
   (Apr. 30, 2026), https://senatedfl.mn/minnesota-senate-passes-legislation-to-ban-
   prediction-markets/..................................................................................................15

CFTC, Contracts & Products,
   https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm...................8

CFTC, Derivative Clearing Organizations (DCO),
  https://www.cftc.gov/IndustryOversight/IndustryFilings/ClearingOrganizations?
  Status=Registered&Date_From=&Date_To=&Show_All=1..........................................27

CFTC, Designated Contract Market Products: 17063, https://www.cftc.gov/
IndustryOversight/IndustryFilings/TradingOrganizationProducts/17063......................... 17

CFTC, Designated Contract Market Products: 58528, https://www.cftc.gov/
IndustryOversight/IndustryFilings/TradingOrganizationProducts/58528......................... 17

CFTC, Futures Glossary: A Guide to the Language of the Futures Industry,
  https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/
  CFTCGlossary/index.htm....................................................................................... 4

CFTC Staff Letter No. 93-66 (June 18, 1993),
  https://www.cftc.gov/sites/default/files/idc/groups/
  public/@lrlettergeneral/documents/letter/93-66.pdf ....................................................... 8

CFTC, Release Number 9199-26,
  *CFTC and MLB Sign Groundbreaking MOU* (Mar. 19, 2026),
  https://www.cftc.gov/PressRoom/PressReleases/9199-26 ................................................ 9

*30 Day Federal Funds*, CME Group,
  https://www.cmegroup.com/markets/interest-rates/stirs/30-day-federal-
  fund.contractSpecs.html ........................................................................................ 17

*Daily Exchange Volume and Open Interest*, CME Group,
  https://www.cmegroup.com/market-data/browse-data/exchange-volume.html (last
  visited May 27, 2026)............................................................................................ 20

## PRELIMINARY STATEMENT

Minnesota has enacted the first and only state law that expressly makes the trading of event contracts a criminal offense.  *See* Dkt. 23-1, pp. 36–40.  Article 6 of SF 3432 makes it a felony to "create[] a prediction market," which is defined as "a system that allows consumers to place a wager on the future outcome of a specified event that is not determined or affected by the performance of the parties to the contract."  Minn. Stat. § 609.7615(1)(e), (2)(1).  It also imposes criminal liability for "intentionally facilitat[ing] the operation of a prediction market" by various means, *id.* § 609.7615(2)(3), "provid[ing] data, information, or verification services, including the provision of event outcomes, directly to a prediction market," *id.* § 609.7615(2)(4), or "advertis[ing] or market[ing] financial or technological products that promote transactions" on a prediction market, *id.* § 609.7615(3).

Plaintiffs the United States of America ("USA") and the Commodity Futures Trading Commission ("CFTC" or "Commission"), a federal executive agency, seek a preliminary injunction from this Court holding that Article 6 of SF 3432 is preempted and prohibiting Defendants from enforcing it.  Under the Commodity Exchange Act ("CEA"), the event contracts that Minnesota seeks to prohibit are "swaps," and the "prediction markets" on which these event contracts trade include CFTC-regulated Designated Contract Markets ("DCMs").  The CEA expressly confers "exclusive jurisdiction" upon the Commission to regulate, among other things, "transactions involving swaps" that are traded on DCMs, 7 U.S.C. § 2(a)(1)(A), and more broadly, the Act provides a "comprehensive regulatory structure [for] oversee[ing] the volatile and esoteric futures

1

trading complex" that is administered—and administered only—by the Commission, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982). State law that purports to regulate or prohibit transactions involving swaps is therefore preempted.

Although Minnesota's express criminalization of event contracts is the first legislation of its kind, the State is not the first to intrude into the Commission's regulatory jurisdiction over event contracts—and courts have been swift to respond with injunctive relief. Last month, the Third Circuit upheld a preliminary injunction barring New Jersey from enforcing its gambling laws against sports event contracts listed by KalshiEX, a CFTC-regulated DCM. *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 232 (3d Cir. 2026). And the District of Arizona and the Middle District of Tennessee have entered preliminary injunctions enjoining States from enforcing their gambling laws as applied to sports event contracts listed on CFTC-regulated DCMs. *KalshiEX LLC v. Johnson*, __ F. Supp. 3d __, 2026 WL 1223373, at *9 (D. Ariz. May 5, 2026); *KalshiEX v. Orgel*, No. 3:26-cv-34, 2026 WL 474869, at *12 (M.D. Tenn. Feb. 19, 2026).

The case for emergency injunctive relief is even stronger here. Minnesota does not seek simply to enforce existing gambling laws with respect to *sports* contracts; it passed a criminal prohibition targeted at *all event contracts*—including contracts based on events related to elections, governmental action, and—most sweepingly of all—"any event or events happening to a natural person or group of people." Many of these event contracts have traded on CFTC-regulated DCMs for decades. Further, SF 3432 redefines the term "bet" under Minnesota gambling law to eliminate a safe harbor for derivatives contracts on

2

*all* commodities, instead limiting the safe harbor to derivatives contracts for *physical* commodities—which threatens to classify some of the highest-volume futures, options, and swap trades in the United States as gambling violations. And to top it all off, Minnesota has threatened not only the DCMs that offer event contracts with prosecution for felony violations of criminal law, but also persons who provide the essential support services needed for DCMs to operate legally and effectively—including CFTC-regulated Futures Commission Merchants (FCMs) and Derivatives Clearing Organizations (DCOs), and potentially even professional sports leagues, major news organizations, or financial institutions that provide verification data and funds to prediction markets.

Minnesota's attempt to criminalize derivatives contracts is precisely what Congress sought to prevent by passing the Commodity Exchange Act and creating a uniform federal regulatory scheme. The State's novel and aggressive criminalization of activities regulated by the Commission blatantly violates that law and the Supremacy Clause, will shut down the operations of CFTC-approved exchanges in Minnesota, and must be enjoined before the law can take effect on August 1, 2026.

## BACKGROUND

I.    **The CEA provides the regulatory framework for commodity derivatives markets in the United States, including event-contract markets**

The CEA provides a comprehensive framework that governs transactions in United States commodity derivatives markets. The CFTC is the federal executive agency that administers the CEA, enforces its provisions in federal courts, and regulates derivatives markets. A "derivative" is a financial instrument, such as a future, option, or swap, for

3

which the price is directly dependent upon—that is, "derived from"—the value of something else, such as an agricultural or financial commodity.[1] In general, market participants use derivatives to hedge risks or speculate on commodity price movements.

In enacting the CEA, Congress specifically identified a public interest in federal regulation of derivatives markets because those markets provide a means to distribute economic risks via hedging and speculation. *See* 7 U.S.C. § 5. "Hedging" involves the use of derivatives to protect against price fluctuations.[2] Like securities markets, commodity derivatives markets also include "speculators" who profit from price movements. Speculators are important because they help ensure that hedgers can find counterparties with whom to trade, thereby fostering price discovery and liquidity in the markets. *See generally Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1158 (8th Cir. 1971).

Many derivatives must be traded on a Designated Contract Market, or DCM. DCMs are national boards of trade or exchanges that operate under the regulatory oversight of the Commission. *See* 7 U.S.C. § 7. The Commission designates an exchange as a DCM through a formal application process in which an applicant must demonstrate its ability to comply with detailed statutory and regulatory requirements called "core principles." *Id.*

---

[1] CFTC, Futures Glossary: A Guide to the Language of the Futures Industry, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm.

[2] For instance, airlines that need to buy jet fuel in the foreseeable future might manage the risk that the price will increase by entering into a derivative contract, *e.g.* a futures contract, to hedge against that risk. It would take a "long" position, *i.e.*, a futures contract that will increase in value if the price of fuel increases. On the other hand, a fuel supplier might manage the risk that the price of oil will decline by taking a "short" position, *i.e.*, a futures contract that will increase in value if the price of fuel goes down.

§ 7(d). These core principles require DCMs to, among other things, establish and enforce compliance with market rules, 17 C.F.R. § 38.150(a); list only contracts that are not readily susceptible to manipulation, *id.* § 38.200; and have the capacity to prevent manipulation or price distortions, *id.* § 38.250. Today, 25 exchanges in the United States have active designations from the Commission to operate as a DCM.

## II.   Congress has steadily expanded the Commission's jurisdiction and contracted state jurisdiction over derivatives trading

Minnesota's attempt to ban derivatives trading is nothing new. Before Congress entered the field of futures regulation, States often failed to distinguish between futures trading and illegal "gambling" or "wagering." Indeed, the Minnesota Supreme Court described "betting upon the price of wheat, [as] against public policy, and not only void, but deserving of the severest censure." *Mohr v. Miesen*, 49 N.W. 862, 862 (Minn. 1891) (quoting *Rumsey v. Berry*, 65 Me. 570, 574 (1876)). Likewise, the Georgia Supreme Court described futures contracts for cotton as "speculation on chances, a wagering and betting between the parties." *Cunningham v. National Bank of Augusta*, 71 Ga. 400, 403 (1883). An Illinois statute provided that "the option to sell or buy at a future time any grain or commodity … shall be considered gambling contracts, and shall be void." *Cothran v. Ellis*, 16 N.E. 646, 648 (Ill. 1888). And so on. *See Cohn v. Brinson*, 73 So. 59, 62 (Miss. 1916) (describing "the buying of cotton futures [as] a wager"); *Carson v. Milwaukee Produce Co.*, 113 N.W. 393, 395 (Wis. 1907) (describing commodity futures contracts as "gambling contracts" that are "void"); William W. Mansfield, *A Digest of the Statutes of Arkansas* §

1848 (U.M. Rose ed., 1884) (declaring that "[t]he buying or selling or otherwise dealing in what is known as futures … with a view to profit, is hereby declared to be gambling").

Congress, by contrast, "has recognized the potential hazards as well as the benefits of futures trading," and it accordingly "has authorized the regulation of commodity futures exchanges for over [100] years," beginning with the Future Trading Act of 1921 and Grain Futures Act of 1922. *Curran*, 456 U.S. at 360. Those early federal forays into futures regulation, however, failed to preempt state law. *See Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933) (holding that federal law "did not supersede any applicable provisions of [] Missouri law making gambling in grain futures illegal").

The CEA, enacted in 1936, broadened the federal government's regulatory authority over futures trading and prompted a "[g]radual state retreat from … the entire field of commodities futures regulation." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chicago-Kent L. Rev. 657, 670 (1982). But the Supreme Court again held that States could regulate aspects of commodities trading, explaining that a savings clause in Section 4c of the CEA "serves the function of preventing supersedure and preserving state control in [] areas where state and federal law overlap." *Rice v. Board of Trade of Chicago*, 331 U.S. 247, 255 (1947).

The key turning point came in 1974, when Congress created the Commission and conferred on it "exclusive jurisdiction" over futures trading. Pub. L. No. 93-463, § 201(b), 88 Stat. 1389, 1395 (codified at 7 U.S.C. § 2(a)(1)(A)). "The aim of this provision" was to "'avoid unnecessary, overlapping and duplicative regulation.'" *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001). The 1974 Act also removed the savings clause

6

in section 4c "[i]n order to assure that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (Sept. 9, 1974). Leading proponents of the Act repeatedly indicated that futures regulation would be subject solely to Commission oversight, not state law. *See, e.g.*, H.R. Rep. No. 93-1383, at 35–36 (1974) (Conf. Report) (explaining that the "exclusive grant of jurisdiction to the Commission" would "preempt the field insofar as futures regulation is concerned," and that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern"); S. Rep. No. 93-1131, at 6 (1974) (stating that the Commission's "jurisdiction, where applicable, supersedes State as well as Federal agencies").

Congress has further expanded the preemptive reach of the CEA over the subsequent decades—particularly with respect to "swaps." A "swap" is a type of derivative that encompasses "any agreement, contract, or transaction … that provides for any … payment[ ] or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). In the 2010 Dodd-Frank Act, Congress extended the Commission's "exclusive jurisdiction" to encompass "accounts, agreements …, and transactions involving swaps." Pub. L. No. 111-203, § 722(a)(1)(D), 124 Stat. 1376, 1672 (2010) (codified at 7 U.S.C. § 2(a)(1)(A)). It also added a "Special Rule" granting the Commission authority to prohibit certain swaps called "event contracts" that, in the Commission's view, are contrary to the public interest. *Id.* § 745(a), 124 Stat. at 1736–37 (codified at 7 U.S.C. § 7a-2(c)(5)(C)).

7

### III.    Event contracts have long traded subject to Commission oversight

"Event contracts" are CFTC-regulated "derivative contract[s] whose payoff is based on a specified event, occurrence, or value."[3]  While event contracts have become more popular with the American public in recent years, these contracts are not novel innovations. "Since 1992, Commission-regulated exchanges have listed for trading a variety of commodity futures and options contracts with payout terms based on" events "as diverse as regional insured property losses, the count of bankruptcies, temperature volatilities, corporate mergers, and corporate credit events."  73 Fed. Reg. 25,669, 25,671 (May 7, 2008).  In 1993, the Commission issued a no-action letter to Iowa Electronic Markets, allowing the facility to list event contracts tied to U.S. and Canadian elections.[4]  And by 2005, event contracts encompassed "the accomplishment of certain scientific advances, world population levels, the adoption of particular pieces of legislation," and even "the length of celebrity marriages."  73 Fed. Reg. at 25,670.

Today, event contracts are listed on numerous CFTC-registered DCMs, whether they be relatively new markets like KalshiEX ("Kalshi"), QCX ("Polymarket"), and Gemini Titan, or longstanding ones like North American Derivatives Exchange ("Nadex") and CME Group.  The Commission exercises its exclusive jurisdiction over the transactions on these DCMs by, among other things, requiring them to complete a registration process

---

[3]  CFTC, Contracts & Products, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm.

[4] CFTC Staff Letter No. 93-66 (June 18, 1993), https://www.cftc.gov/sites/default//files/idc/groups/public/@lrlettergeneral/documents/letter/93-66.pdf.

with the Commission before listing products for trading, monitoring their activity, and pursuing enforcement actions as appropriate.

The Commission is also taking additional steps to ensure market integrity around the trading of event contracts. The Commission has signed Memoranda of Understanding with Major League Baseball and the National Hockey League, which establishes a framework for the leagues to exchange information with the Commission in order to ensure market integrity in sports-related event contracts.[5] The Commission issued an Advance Notice of Proposed Rulemaking seeking comment on potential rulemaking around prediction markets. *See* 91 Fed. Reg. 12,516 (proposed Mar. 16, 2026). And the Commission has filed enforcement actions against persons that engage in insider trading on prediction markets. *See CFTC v. Van Dyke*, No. 1:26-cv-3369 (S.D.N.Y.) (enforcement action against U.S. servicemember who used sensitive nonpublic information to trade event contracts related to the ouster of Venezuelan President Nicolás Maduro); *CFTC v. Spagnuolo*, No. 1:26-cv-4419 (S.D.N.Y.) (enforcement action against Google employee who used nonpublic information to trade event contracts related to Google's Year in Search list).

---

[5] CFTC, Release Number 9199-26, *CFTC and MLB Sign Groundbreaking MOU* (Mar. 19, 2026), https://www.cftc.gov/PressRoom/PressReleases/9199-26; CFTC, Release Number 9235-26 (May 21, 2026), https://www.cftc.gov/PressRoom/PressReleases/9235-26.

## IV.    Minnesota attempts to criminally ban event contracts traded on CFTC-regulated derivatives markets

Notwithstanding the Commission's exercise of exclusive regulatory jurisdiction over prediction markets, States have repeatedly attempted to enforce their gambling laws against event contracts.  With the enactment of SF 3432, Minnesota entered the fray.

Article 6 of the law imposes a sweeping ban on "prediction markets," a term defined to mean "a system that allows consumers to place a wager on the future outcome of a specified event that is not determined or affected by the performance of the parties to the contract for" various categories of activity, including: "an athletic event or game of skill," "state or national emergencies," "any event or events happening to a natural person or group of people," "a federal, state or local election," and "the specific decisions of the federal, state, or local government and the government's agencies, employees, and officers, the primary underlying characteristic of which is not financial, commercial, or economic or the outcome is under the complete control of any person or the outcome is known by any person in advance." Minn. Stat. § 609.7615(1)(e)(1), (3), (4), (5).  A "wager," in turn, is defined to mean "a contract, including a prediction market contract, whereby the parties to the contract agree to a gain or loss by one to the other of money, property, or benefit." *Id.* § 609.7615(1)(f).

SF 3432 makes it a felony to, among other things, "create[] a prediction market," "intentionally facilitate[] the operation of a prediction market by" various means, "provide[] data, information, or verification services, including the provision of event outcomes, directly to a prediction market" for the purpose of "settl[ing] wagers," or

10

"provide[] supportive services to a prediction market knowing that the services will be used to … transfer funds, or make or process payments for the purpose of … settl[ing] wagers." *Id.* § 609.7615(2).  It is also a felony to "advertise[] or market[] financial or technological products that promote transactions prohibited under this section."  *Id.* § 609.7615(3). Additionally, SF 3432 empowers the Director of the Minnesota Department of Public Safety's Alcohol and Gambling Enforcement Division to issue cease-and-desist orders and bring enforcement actions in state court for violations of the prediction-market prohibition. *Id.* § 299L.03(12)(a)–(b).  And the law substantially expands the scope of derivatives products that can be classified as a "bet" under Minnesota gaming law.  *Id.* § 609.75(3)(2).

Absent injunctive relief, these provisions will become effective on August 1, 2026. *See* SF 3432, Art. 6, §§ 2, 3 Effective Date.  Plaintiffs appreciate this Court's intention to issue a decision before the law's effective date, and respectfully request a decision by Friday, July 17, 2026, which will provide regulated parties with advance notice of their legal obligations and allow the losing party sufficient opportunity to seek interim relief from the Eighth Circuit.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When a State or state official is the nonmoving party, the equities and public interest factors merge.  *Eggers v. Evnen*, 48 F.4th 561, 564 (8th Cir. 2022).

11

## ARGUMENT

This Court should enter a preliminary injunction holding that Article 6 of SF 3432 is facially preempted and therefore unenforceable. Minnesota's aggressive law would criminalize the trading of derivatives on CFTC-regulated markets—including swaps that have traded on DCMs for decades under Commission oversight—and it would make a felony of adjacent services that are essential to the orderly functioning of CFTC-regulated markets. Allowing the law to go into effect would intimidate federally regulated entities and those who partner with them, and ultimately would shutter the operations of federally regulated markets in Minnesota. That would irreparably harm the Federal Plaintiffs and be antithetical to the public interest.

## I.      Plaintiffs have standing

Standing requires Plaintiffs to "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To establish an injury in fact, Plaintiffs must demonstrate "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical[.]" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

As the Eighth Circuit has explained, "[t]he United States has a legally protected interest in enforcing federal law," and where a state law "impair[s] that interest," the federal government has a "concrete and particularized" injury that is "actual or imminent." *United States v. Missouri*, 114 F.4th 980, 984 (8th Cir. 2024). Put another way, "[i]nterference with the federal government's interest in enforcing federal law is sufficient to establish that

[a state law's] implementation injure[s] the United States." *Id.* at 985; *see United States v. Florida*, 172 F.4th 1201, 1222 (11th Cir. 2026) ("The United States generally has standing to sue when it alleges an 'injury to its sovereignty arising from violation of its laws[.]'" (quoting *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000)) (collecting cases)). For this reason, the federal government regularly brings preemption actions to invalidate state laws that are contrary to federal law. *See, e.g.*, *United States v. Iowa*, 126 F.4th 1334, 1341 (8th Cir. 2025), *vacated as moot* 2025 WL 1140834 (8th Cir. Apr. 15, 2025); *Missouri*, 114 F.4th at 983; *Arizona v. United States*, 567 U.S. 387, 394 (2012); *United States v. South Carolina*, 720 F.3d 518, 528 (4th Cir. 2013).

Here, the United States's "legally protected interest in enforcing federal law" is directly "impair[ed]" by SF 3432. *Missouri*, 114 F.4th at 984. Minnesota seeks to criminalize federally regulated swaps and the exchanges that offer them. Congress subjected these transactions to the Commission's "exclusive jurisdiction," 7 U.S.C. § 2(a)(1)(A), and more broadly, it empowered the Commission to administer the CEA's "comprehensive regulatory structure" for derivatives transactions. *Curran*, 456 U.S. at 356. If Minnesota can enforce its law, the blow to the Commission's sovereign interest as exclusive regulator would be substantial. *See KalshiEX LLC v. Johnson*, __ F. Supp. 3d __, 2026 WL 1223373, at *3 (D. Ariz. May 5, 2026) ("The CFTC therefore has standing to seek to enjoin Arizona's enforcement of its gambling laws against event contracts traded on DCMs.").

The Commission has already experienced injuries associated with States' attempts to ban event contracts. DCMs have sought guidance from the Commission's staff as to

13

appropriate steps to take under the CEA and Commission regulations if ordered to cease operations in particular States.  The Commission has devoted resources to determining the necessary compliance requirements, which have diverted Commission resources away from its core function of supervising DCMs and other markets.  *See* Ex. A, Declaration of Joshua Beale ¶ 7.  These diversions will only be amplified by Minnesota's new law.

Although SF 3432 does not become effective until August 1, the mere passage of a preempted law causes a current and ongoing injury to the United States by intruding on its exclusive jurisdiction.  Even so, Plaintiffs' injuries are sufficiently imminent to bring a pre-enforcement challenge.  A "threatened injury" satisfies the "actual or imminent" requirement if it is "certainly impending, or there is a substantial risk that the harm will occur."  *Department of Commerce v. New York*, 588 U.S. 752, 766–67 (2019).  That is the case here: In two months, the act of offering, or even supporting the offering of, CFTC-regulated event contracts on CFTC-registered exchanges will be a criminal offense in Minnesota.  CFTC-regulated markets plan on continuing to offer those contracts absent the law.  And Defendants have not disavowed enforcement.  *See Minnesota Chapter of Associated Builders & Contractors, Inc. v. Blissenbach*, 155 F.4th 1015, 1021 (8th Cir. 2025) ("[B]ecause state officials have not disavowed enforcing it, the Contractors have standing.").  Quite the opposite: Senator John Marty, who spearheaded the prediction-market ban, made clear that "[w]e are working to stop prediction markets in Minnesota,"

14

and that "[u]nless we act quickly, prediction markets will create a massive increase in gambling addiction, and will undermine lawful, regulated gambling in Minnesota."[6]

Accordingly, there is a more than "substantial risk" that the "impending" threat to federal law will occur in short order, absent judicial intervention. *See Iowa*, 126 F.4th at 1343 (finding an "imminent" injury in fact even where a State "has yet to enforce [an] Act"). And the looming enforcement of the law already disrupts CFTC-regulated markets, chills the operations of DCMs, and makes it more difficult for the Commission to uniformly regulate a market over which Congress gave it "exclusive jurisdiction." *See United States v. Texas*, 97 F.4th 268, 278 (5th Cir. 2024) (rejecting argument "that the United States lacks a cognizable path for seeking to enjoin an allegedly preempted state law," particularly where "the United States has asserted that the laws at issue may disrupt or interfere with its core constitutional authority"). This blatant intrusion into and disruption of the Commission's regulatory authority is a classic injury in fact that satisfies Article III.

## II.     Plaintiffs are likely to succeed in establishing that federal law preempts SF 3432

Minnesota has no authority to regulate—much less criminalize—event contracts listed on CFTC-regulated markets for two reasons. First, event contracts qualify as "swaps" under the CEA. Second, Congress gave the Commission "exclusive jurisdiction" to regulate transactions involving swaps, thereby preempting state regulation. Plaintiffs

---

[6] Sen. John Marty, *Minnesota Senate Passes Legislation to Ban Prediction Markets* (Apr. 30, 2026), https://senatedfl.mn/minnesota-senate-passes-legislation-to-ban-prediction-markets/.

are thus likely to succeed on the merits of their preemption claim, which warrants a preliminary injunction.

### A. Minnesota seeks to criminalize "swaps" under the CEA

Congress "defined 'swap' broadly." *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025). The term encompasses "any agreement, contract, or transaction … that provides for any purchase, sale, payment, or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A), (A)(ii). Event contracts—including those targeted by SF 3432—straightforwardly qualify as "swaps" under this definition.[7] *See Flaherty*, 172 F.4th at 227–28 (holding that "Kalshi's sports-related event contracts" are "'swaps' subject to the CFTC's jurisdiction"); *id.* at 233 (Roth, J., dissenting) ("A plain reading of the Act's text suggests that Kalshi's sports-event contracts fit comfortably within the statutory definition" of swaps.).

**1.** For starters, event contracts make "payment … dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency." 7 U.S.C. § 1a(47)(A)(ii). Consider an event contract in which a participant takes a "yes" position on a Democrat winning the Minnesota gubernatorial race in 2026. "[P]ayment" under that

---

[7] The United States Senate agrees. On April 30, 2026, the Senate changed its rules to add a provision barring members from participating in "prediction market[s]" and describing those transactions as "swap[s] … as defined in section 1a of the Commodity Exchange Act … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of a specific event or contingency." S. Res. 708, 119th Cong. (2026).

contract is plainly "dependent on the occurrence … of an event"—namely, a Democrat winning the race for governor. Likewise, a "yes" position on a Democrat winning more than 55% of the vote is "dependent on … the extent of the occurrence of an event"—the extent to which the Democrat wins the race for governor. *See Johnson*, 2026 WL 1223373, at *4 (explaining that the phrase "*extent of* the occurrence of an event or contingency" "reaches how an event unfolds, not just whether it happens").

**2.** Additionally, to be a swap, the "event" on which the payoff is dependent must be "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The event contracts targeted by SF 3432 easily clear the bar. The law singles out, for instance, event contracts about "election[s]," which undeniably have consequences for governmental taxing and spending. Minn. Stat. § 609.7615(1)(e)(5). It also targets contracts about "the specific decisions of the federal, state, or local government and the government's agencies, employees, and officers" where "the outcome is known by any person in advance," *id.*, which could prohibit well-established event contracts on whether the Federal Reserve will change the Federal Funds rates[8] or whether the Bureau of Labor Statistics will announce a drop in the Consumer Price Index[9] or the unemployment rate.[10]

---

[8] *30 Day Federal Funds*, CME Group, https://www.cmegroup.com/markets/interest-rates/stirs/30-day-federal-fund.contractSpecs.html.

[9] CFTC, Designated Contract Market Products: 58528, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/58528.

[10] CFTC, Designated Contract Market Products: 17063, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/17063.

Other States have argued that sports events—which SF 3432 also targets, *id.* § 609.7615(1)(e)(1)—do not entail economic consequences. But even that is not true: the outcome of a sporting event has "potential" to affect "numerous … stakeholders, including sponsors, advertisers, television networks, franchises, and local and national communities." *Flaherty*, 172 F.4th at 227–28. Those "financial consequences" may not be felt "right away"—indeed, they may never *actually* occur—but "Congress chose to use [the qualifier] 'potential,' which is broad." *Orgel*, 2026 WL 474869, at *8; *see Alabama Power Co. v. Costle*, 636 F.2d 323, 353 (D.C. Cir. 1979) (recognizing that "potential … will always and inherently exceed actual"). And more fundamentally, SF 3432 is not limited to sports: it bars contracts dependent on a wide range of events—war, human-made disasters, state or national emergencies, public-health crises, elections, pop culture, legal actions, public statements, and more, Minn. Stat. § 609.7615(1)(e), that undeniably can be "associated" with "potential" economic consequences, 7 U.S.C. § 1a(47)(A)(ii).

**3.** The CEA's "Special Rule" further underscores that event contracts are swaps within the Commission's jurisdiction, especially the event contracts targeted by SF 3432. The Special Rule provides that "[i]n connection with the listing of agreements, contracts, transactions, or *swaps* in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency …, the Commission may determine that such [contracts] are contrary to the public interest if [they] involve" various enumerated activities, including "terrorism," "assassination," "war," and "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added). And if the Commission determines an event contract is contrary to the public interest, it cannot be listed. *Id.* § 7a-2(c)(5)(C)(ii). The Special Rule thus confirms (1) the

18

Commission's jurisdiction over event contracts involving the enumerated activities, and (2) that the definition of "swap" encompasses event contracts.

Here, again, SF 3432 expressly applies to event contracts that Congress defined as "swaps."  Specifically, it targets contracts related to "war" and "acts of terrorism," Minn. Stat. § 609.7615(1)(e)(3), "the death, assassination, or attempted killing of a person or group of persons," *id.* § § 609.7615(1)(e)(7), and "any game played with cards, dice, equipment, or any mechanical or electronic device or machine," *id.* § § 609.7615(1)(e)(2). Congress, however, has characterized event contracts based on these types of underlying events as "swaps" and expressly subjected them to the Commission's jurisdiction to approve or disapprove based on a public-interest analysis.  7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii). Minnesota seeks to usurp that authority.

**4.**  Were all that not enough, SF 3432 acknowledges on its face that it purports to cover derivatives within the Commission's jurisdiction.  Before the enactment of SF 3432, Minnesota gambling law provided that "a contract for the purchase or sale at a future date of securities or other commodities" is not a "bet."  Minn. Stat. § 609.75(3)(2); *see ACLI Int'l Commodity Servs., Inc. v. Lindwall*, 347 N.W.2d 522, 524–25 (Minn. Ct. App. 1984) (Under § 609.75(3)(2), "[t]rading commodities futures does not constitute gambling."). Yet as amended by SF 3432, the law now provides that the term "bet" does not include "a contract for the purchase or sale for future delivery of securities or any physical commodities or any option on such futures contract, such securities or commodities, or on the prices thereof, *except as provided in section 609.7615*."  Minn. Stat. § 609.75(3)(2) (as amended) (emphasis added). If event contracts traded on prediction markets were not

19

"contract[s] for the purchase or sale at a future date of … commodities," there would have been no need for the Legislature to insert this new caveat into the definition of "bet."

In fact, the redefinition of "bet" threatens consequences well beyond event contracts and prediction markets.  As revised, the law carves out only futures and options contracts on *physical commodities*.  But the Commission's jurisdiction under the CEA is not limited to "physical commodities."  The very definition of "commodity" includes "all services, rights, and interests … in which contracts for future delivery are presently or in the future dealt in"—which encompasses intangible measures. 7 U.S.C. § 1a(9).  Likewise, the term "excluded commodity"—which, despite the name, *is* a type of commodity—includes "an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure"—all nonphysical measures.  *Id.* § 1a(19).  And the definition of "swap" expressly encompasses "an interest rate swap," "a foreign exchange swap," "a credit default swap," "a weather swap," and "an emissions swap"—again, nonphysical.  *Id.* § 1a(47)(A)(iii). Intangible commodity derivatives, moreover, are hugely significant: "interest rate" futures and options trade at the highest volume on some of the nation's largest derivatives exchanges.[11]  Minnesota's law, therefore, exposes a vast range of CFTC-regulated financial instruments to state gambling law, not just event contracts.

---

[11]  *Daily   Exchange   Volume   and   Open   Interest*,   CME   Group, https://www.cmegroup.com/market-data/browse-data/exchange-volume.html (last visited May 27, 2026).

**B.      SF 3432 is preempted by federal law**

Under the Constitution's Supremacy Clause, "federal law preempts contrary state law." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 162 (2016).   Most straightforwardly, Congress can "express[ly]" withdraw specified powers from the States. *Arizona*, 567 U.S. at 399.  In addition, "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by … exclusive [federal] governance."  *Id.*   "[S]tate laws are [also] preempted when they conflict with federal law."  *Id.*  Whether on express, field, or conflict preemption grounds, federal law preempts Article 6 of SF 3432 in its entirety.

**1.      The CEA expressly preempts state regulation of commodity derivatives transactions**

The CEA confers on the Commission "exclusive jurisdiction" to regulate "accounts, agreements, … and transactions involving swaps."  7 U.S.C. § 2(a)(1)(A).  That expression of preemptive intent could hardly be plainer.  *See Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011) ("[T]he plain wording of the clause … contains the best evidence of Congress' preemptive intent.").   If the Commission has "exclusive jurisdiction … with respect to" event contracts, other governmental authorities—including the States— necessarily lack "jurisdiction" over event contracts.  7 U.S.C. § 2(a)(1)(A); *see Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 232 (6th Cir. 1980), *aff'd*, 456 U.S. 353 (1982) ("[T]he thrust of the [exclusive-jurisdiction] provision was to ensure that regulatory bodies other than the CFTC would not interfere with the orderly development and enforcement of commodities regulation.").

The balance of § 2(a)(1)(A) reinforces that default rule. It states that "[e]xcept as hereinabove provided," Congress did not "supersede or limit the jurisdiction at any time conferred on … regulatory authorities under the laws of … any State" or "restrict" State authorities "from carrying out their duties and responsibilities." *Id.* (emphasis added). The CEA thus contemplates States retaining regulatory jurisdiction "[e]xcept" with respect to "accounts, agreements … and transactions involving swaps." *Id.*; *see Johnson*, 2026 WL 1223373, at *6 (holding that this "savings clause underscores the [CEA's] preemptive effect"). Accordingly, "courts have held that [§] 2(a)(1) of the CEA preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980); *see Christensen Hatch Farms, Inc. v. Peavey Co.*, 505 F. Supp. 903, 910 (D. Minn. 1981) (same). Such a savings clause would not be necessary if it were otherwise. *See Effex Capital, LLC v. National Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) ("to give 'full effect' to both the savings clause and the jurisdictional clause," "preemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of a futures market'").

Other provisions of the CEA underscore the primacy of federal law. Section 13a-2(1), for instance, empowers a State to file suit to enjoin violations of the CEA or a Commission regulation. 7 U.S.C. § 13a-2(1). The natural implication is that States generally lack authority to apply their *own* laws to CFTC-regulated transactions.[12] And

---

[12] States may sue in state court for "an alleged violation of any general civil or criminal antifraud statute of such State." 7 U.S.C. § 13a-2(7). Again, the implication is that States cannot sue for alleged violations of *other* state laws, such as laws (like SF 3432) targeted at a class of derivatives.

even when purporting to enforce the CEA, States cannot sue "a contract market," 7 U.S.C. § 13a-2(1), doubling the inference that States cannot criminalize the operation of a CFTC-registered prediction market.

Likewise, Section 16(e)(1) insulates various laws and actions from preemption, including state laws applicable to certain *off-DCM* transactions or *unregistered* persons. 7 U.S.C. § 16(e)(1)(B)–(C). Yet Congress omitted any potential for state law to apply to *on-DCM* transactions or *registered* persons, *id.*, further reinforcing that state law has no application to the swap transactions and DCMs targeted by SF 3432.

Some courts, to be sure, have pointed to *other* preemption provisions—namely, § 16(e)(2) and § 16(h)—and concluded that because these do not expressly preempt state gambling laws applicable to swaps, such laws remain enforceable. *E.g.*, *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 681 (D. Md. 2025). Neither § 16(e)(2) nor § 16(h), however, detracts from the preemptive force of § 2(a)(1).

Take § 16(e)(2) first. That language was added to clarify that even where a contract is "excluded" or "exempted" by the Commission, the CEA nonetheless "supersede[s] and preempt[s] the application of any State or local law that prohibits or regulates gaming" as to those contracts. 7 U.S.C. § 16(e)(2); *see Thrifty Oil Co. v. Bank of Am. National Tr. & Sav. Ass'n*, 322 F.3d 1039, 1057 (9th Cir. 2003) ("In other words, where the CFTC exempts transactions from the CEA pursuant to Section 4(c), those same transactions benefit from preemption of state bucket shop laws under Section 12(e)(2)(A)."). If state law is preempted as to *excluded* or *exempted* transactions, it follows *a fortiori* that state law is

23

preempted as to *non-excluded* and *non-exempted* transactions on an exchange—which, after all, come within the Commission's "exclusive jurisdiction."  7 U.S.C. § 2(a)(1)(A).

Section 16(h) provides that a swap "shall not be considered to be insurance" and accordingly "may not be regulated as an insurance contract under the law of any State."  7 U.S.C. § 16(h).   The preemption of state insurance law in no way implies the non-preemption of other state laws.  Section 16(h) was enacted in the aftermath of the 2008 financial crisis, which many in Congress attributed to credit default swaps—"an arrangement similar to an insurance contract."  *Merrill Lynch Int'l v. XL Cap. Assur. Inc.*, 564 F. Supp. 2d 298, 300 (S.D.N.Y. 2008).  Under the circumstances, Congress's use of a "belt-and-suspenders approach to make sure that *all*" swaps were governed by federal law is a perfectly "likely" inference, *see Atlantic Richfield Co. v. Christian*, 590 U.S. 1, 14 n.5 (2020), far more "likely" than the notion that Congress only preempted state insurance law as to swaps but implicitly left other state law intact (all whilst giving the Commission "exclusive jurisdiction" over swaps).

## 2.    The CEA occupies the field of regulating trading on a DCM

"Field preemption occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation,'" *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 479 (2018), or where "there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," *Arizona*, 567 U.S. at 399.   "[L]ike all [forms of] preemption," field preemption "must be grounded 'in the text and structure of the statute at issue.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020).

24

As the Third Circuit held, the CEA preempts the field of "regulation of trading on a DCM (a form of futures trading)." *Flaherty*, 172 F.4th at 229. Congress gave the Commission "exclusive jurisdiction" over "swaps … traded or executed on a [DCM]," and it allowed state "regulatory authorities" to retain jurisdiction only "[e]xcept as hereinabove provided." 7 U.S.C. § 2(a)(1)(A). DCMs, moreover, are subject to extensive regulation by the Commission. They must, among other things, register with the Commission, *id.* § 7(a); comply with "core principle[s]" governing trading, *id.* § 7(d); and self-certify compliance with the CEA and the Commission's regulations, *id.* § 7a-2(c)(1). "These provisions regulate every aspect of DCMs, … leaving no room for state regulation." *Johnson*, 2026 WL 1223373, at *6; *see also Stuber v. Hill*, 170 F. Supp. 2d 1146, 1151 (D. Kan. 2001) ("Congress's intent was to provide the CFTC with exclusive jurisdiction to regulate commodities" and "[s]uch exclusive jurisdiction precludes states from exercising supplementary regulatory authority over commodity transactions.").

Congress understood this when it created the Commission and the "comprehensive regulatory structure" it is charged with administering. *Curran*, 456 U.S. at 356. As the Conference Report details, the "exclusive grant of jurisdiction" to the Commission was designed to "preempt the field insofar as futures regulation is concerned," such that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." H.R. Rep. No. 93-1383, at 35–36 (1974). Congress also deleted from the CEA language that allowed the States to retain a measure of regulatory authority, which "assure[d] that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (Sept. 9, 1974); *see Effex Capital*, 933 F.3d at 894 ("[A] catalyst for

25

the significant [1974] amendments to the Commodity Exchange Act was a fear that, without increased federal regulation, the states would regulate the futures markets to a chaotic effect.").

The enactment of the Special Rule in 2010 further consolidated the Commission's control over the field of event contracts traded on DCMs. *See* 7 U.S.C. § 7a-2(c)(5)(C). That Rule, again, grants the Commission discretionary authority to approve or disapprove of event contracts on DCMs that involve certain enumerated categories of activity. *Id.* § 7a-2(c)(5)(C)(i)–(ii); 17 C.F.R. § 40.11(c)(2). By creating a specific public-interest review process, Congress clearly signaled that these contracts are within the Commission's exclusive regulatory purview, not the States'. As discussed above (*supra* 18–19), SF 3432 targets event contracts that involve precisely these activities—yet another indication that the law directly invades the Commission's exclusive domain.

"[A]t the very least," then, Congress has field preempted "the regulation of trading on a DCM," which encompasses "event contracts" traded on prediction markets. *Flaherty*, 172 F.4th at 228–29.

### 3.   SF 3432 conflicts with the CEA and Commission Rules

Finally, "conflict preemption … prohibits [a State] from regulating sports-related event contracts on CFTC-licensed DCMs." *Flaherty*, 172 F.4th at 229. Conflict preemption comes in two varieties: when "compliance with both state and federal law is impossible" or when "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Pharm. Rsch. & Manufacturers of Am. v. McClain*, 95 F.4th 1136, 1140 (8th Cir. 2024). Both apply here.

26

**1.** Compliance with both SF 3432 and federal law is impossible.  A DCM is required by federal law to provide "impartial access to its markets and services" to all its "members," and to provide "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner."  17 C.F.R. § 38.151(b).  If SF 3432 goes into effect, however, then DCMs will be forced to discriminate against Minnesotans by delisting event contracts there.  That would violate the requirement of "impartial" and "non-discriminatory" access.  *See Johnson*, 2026 WL 1223373, at *8 (holding that if event contracts are prohibited under Arizona law, "a DCM operator must exclude Arizona residents from trading event contracts on its platform, in violation of 17 C.F.R. § 38.151(b) and (b)(1)").

Additionally, the CEA requires swap transactions to be cleared through a Derivatives Clearing Organization (DCO) registered with the Commission.  7 U.S.C. § 2(h)(1); 17 C.F.R. § 38.601(a).  The Commission has accordingly licensed various DCOs to clear transactions for DCMs that provide event contracts.[13]  But Minnesota law makes it a crime for a DCO to clear event-contract transactions—specifically, by making it a felony to "intentionally facilitate[] the operation of a prediction market by … directing the disposition of funds … to settle wagers made by consumers," Minn. Stat. § 609.7615(2)(3)(ii), or to "provide supportive services [used to] transfer funds … for the purpose of … settl[ing] wagers," *id.* § 609.7615(2)(5).  Thus, there is no way to clear an event contract in compliance with federal law without requiring a DCO to commit a

---

[13]    CFTC, Derivative Clearing Organizations (DCO), https://www.cftc.gov/IndustryOversight/IndustryFilings/ClearingOrganizations?Status=R egistered&Date_From=&Date_To=&Show_All=1.

Minnesota criminal offense—a direct conflict between state and federal law that requires state law to give way.

2. If nothing else, subjecting CFTC-regulated markets to state-by-state requirements would stand as an obstacle to federal regulation. "As Congress recognized in enacting the [CFTC] Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *American Agric. Movement, Inc. v. Board of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992); *see Johnson*, 2026 WL 1223373, at \*8 ("If states could prosecute DCM operators for offering event contracts, the operators would face the prospect of fifty different regulators, each capable of restricting which contracts may be listed on each exchange."). Thus, allowing States to regulate derivatives like event contracts could re-introduce the "total chaos" Congress sought to prevent by providing the Commission with exclusive jurisdiction over futures trading in 1974.[14]

SF 3432's numerous facilitation crimes also stand as an obstacle to Congress's objective of allowing derivative markets to function under Commission oversight. The law criminalizes the operation or control of a "platform or system" used "to make wagers in a prediction market"; "intentionally facilitat[ing] the operation of a prediction market," "provid[ing] data, information, or verification services" to settle wagers, and "provid[ing] supportive services to a prediction market." Minn. Stat. § 609.7615(2)(2)–(5). These

---

[14] *See* Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

28

services are instrumental to the orderly functioning of a DCM, and by outlawing them, Minnesota would effectively cripple the DCMs themselves. Because the facilitation provisions purport to regulate "the actual operation of the commodity futures markets," they are also preempted. *American Agric.*, 977 F.2d at 1156.

### III.   The remaining factors favor granting preliminary relief

Absent an injunction, the federal government will suffer irreparable harm. It is well established that, "[i]n most instances, constitutional violations constitute irreparable harm." *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1017 (8th Cir. 2023). Supremacy Clause violations are no exception. *See United States v. California*, 173 F.4th 1060, 1069 (9th Cir. 2026) ("[I]rreparable harm necessarily results from allowing California to enforce a law invalid under the [Supremacy Clause]."); *Texas Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 206 (5th Cir. 2010) ("If a statute is expressly preempted, a finding with regard to likelihood of success fulfills the remaining [preliminary injunction] requirements."). After all, the United States is injured "when its valid laws in a domain of federal authority are undermined by impermissible state regulations," *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *see supra* 12–15, and because that injury cannot be undone by an eventual award of damages, it is necessarily irreparable. *See Cigna Corp. v. Bricker*, 103 F.4th 1336, 1346 (8th Cir. 2024) (irreparable harm occurs where "there is a clear and present need for equitable relief").

Here, Minnesota seeks to criminally prosecute DCMs who are regulated by and operate with the approval of the Commission, as well as those who facilitate their

29

operations. Absent an injunction, the Commission will be powerless to authorize DCMs to offer federally regulated swaps in Minnesota, even though that authority falls to the Commission's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A). There is no remedy at law for such an injury. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("When enforcement actions are imminent … there is no adequate remedy at law.").

The public interest and equities prongs likewise support an injunction because "[f]rustration of federal statutes and prerogatives are not in the public interest." *Alabama*, 691 F.3d at 1301. And where a state law is preempted, the State is not "harm[ed] from … nonenforcement of invalid legislation." *Id.* Accordingly, as the Third Circuit held, it is neither equitable nor in the public interest to allow States to target event contracts in violation of the Supremacy Clause. *See Flaherty*, 172 F.4th at 232; *see also Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 162 F.4th 631, 643 (6th Cir. 2025) ("enjoining the enforcement of a [state gambling] law that violates constitutional rights 'is always in the public interest'"); *Orgel*, 2026 WL 474869, at *10 ("A credible threat of imminent prosecution for a state violation that conflicts with federal law can establish a likelihood of irreparable harm.").

The public interest in an injunction is heightened here, given the sweeping criminal liability that Minnesota seeks to impose. First, the State seeks to criminalize event contracts that have traded subject to CFTC oversight for decades, including contracts related to elections and official government action. More than 3,000 event contracts have

30

been self-certified with the Commission to date,[15] and if Minnesota's law is permitted to stand, all transactions of this variety will become criminal.

Further, if the law goes into effect, any person who "creates a prediction market," "intentionally facilitates [its] operation," or "advertises or markets financial or technological products that promote" prohibited event contracts will all be guilty of a felony. That threatens not only DCMs that offer event contracts—it potentially threatens CFTC-regulated Futures Commission Merchants (FCMs) that act as intermediaries between consumers and DCMs; CFTC-regulated DCOs that clear event contracts; entities that provide verification services to the DCMs such as data-distribution partners, news organizations (including the Associated Press) and even professional sports leagues; websites, television networks, and newspapers that identify event contracts to consumers; blockchain firms that facilitate event-contract trading; and any financial institutions that hold or process funds for transactions.

Finally, were the Court to hold that event contracts are not swaps (*but see supra* 16–20), that could deprive the Commission of *any* jurisdiction over event contracts, thereby creating a regulatory vacuum in the many States where prediction markets are legal. The Commission's jurisdiction to bring enforcement actions for insider trading on prediction markets, for example, has been premised on event contracts qualifying as swaps. *See Van Dyke*, Dkt. 1 ¶¶ 61, 72, 81. If that premise is rejected, the Commission's jurisdiction would become more tenuous.

---

[15] *See* CFTC, Designated Contact Market Products, https://www.cftc.gov/ IndustryOversight/IndustryFilings/TradingOrganizationProducts?Organization=CM.

31

The Court should not tolerate this massive short-circuiting of the Commission's jurisdiction. Congress created "a comprehensive regulatory structure" over "futures trading," *Curran*, 456 U.S. at 356, and it vested jurisdiction over swaps—including event contracts—exclusively with the Commission. Minnesota's incursion into the Commission's domain is unlawful. At minimum, the Court should preserve the status quo by entering a preliminary injunction, which would protect the federal government from irreparable harm and preserve market stability while the Court considers the merits.

## CONCLUSION

The United States and the Commission respectfully ask this Court to enter a preliminary injunction prohibiting Minnesota from enforcing Article 6 of SF 3432.

Dated: May 28, 2026                     Respectfully submitted,


                                        By: */s/ Henry J. Dickman*
                                        Henry J. Dickman
                                        Senior Assistant General Counsel
                                        U.S. Commodity Futures Trading Commission
                                        Three Lafayette Centre
                                        1155 21st Street, N.W.
                                        Washington, DC 20581
                                        Tel. (202) 418-5607
                                        hdickman@cftc.gov

32

*Attorneys for the United States of America*

PERRY SEKUS
Assistant U.S. Attorney
U.S. Attorney's Office
U.S. Attorney's Office for the District of
Minnesota, Civil Division
300 S. 4th Street, Suite 600
Minneapolis, MN 55415
Tel. 612-664-5600
perry.sekus@usdoj.gov

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney
General

TIBERIUS DAVIS
Counsel to the Assistant Attorney General
450 5th St. NW
Washington, DC 20001
tiberius.davis@usdoj.gov
Tel. 202-860-8970

ALEXANDRA McTAGUE SCHULTE
Senior Litigation Counsel
alexandra.schulte@usdoj.gov
Tel. 202-718-0483

*Attorneys for the Commodity Futures Trading Commission*

TYLER S. BADGLEY
   General Counsel
M. JORDAN MINOT
   Deputy General Counsel
HENRY J. DICKMAN
   Senior Assistant General Counsel
ANNE STUKES
   Senior Assistant General Counsel
CARLIN METZGER
   Senior Assistant General Counsel
ANDREW J. WEISBERG
   Senior Assistant General Counsel

U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581
Tel. 202-209-1087
Fax. 202-418-5567
tbadgley@cftc.gov
jminot@cftc.gov
hdickman@cftc.gov
astukes@cftc.gov
cmetzger@cftc.gov
aweisberg@cftc.gov

33

**<u>Certification Pursuant to D. Minn. Local Civil Rule 7.1(f) and 7.1(h)</u>**

I, Henry Dickman, hereby certify that this document was prepared on a computer using Microsoft Word, and the word count for this memorandum of law is 8,360, inclusive of all headings, footnotes, and quotations, and exclusive of the caption, table of contents, table of authorities, signature block, and certificates of compliance. All text in this memorandum, including footnotes, is set in 13-point Times New Roman font.

Dated: May 28, 2026

/s/ *Henry J. Dickman*
Henry J. Dickman

34